UNITED STATES of America,
Plaintiff–Appellant,

v.

Jose Luis GUZMAN and Sonia Cruz–
Lazo, Defendants–Appellees.

Nos. 87–2325, 87–2231.

United States Court of Appeals,
Tenth Circuit.

Dec. 30, 1988.

William L. Lutz, U.S. Atty. James D. Tierney, Asst. U.S. Atty., Albuquerque, N.M., for plaintiff-appellant.

Howard Sohn, Miami, Fla., for defendant-appellee Guzman.

David J. Finger of Levine & Finger, Miami, Fla., for defendant-appellee Cruz–Lazo.

Before SEYMOUR and SETH, Circuit Judges, and O'CONNOR,* District Judge.

SEYMOUR, Circuit Judge.

Defendants Jose Guzman and Sonia Cruz–Lazo were each charged with one count of possession of cocaine with intent to distribute. The district court granted defendants' motion to suppress evidence uncovered when their car was stopped. The United States appeals, and we remand for further proceedings.

I.

On August 3, 1987, Jose Guzman and his wife, Sonia Cruz–Lazo, were driving a rented 1987 Cadillac with Florida license plates west through New Mexico on Interstate 40. The car was traveling at a lawful speed. New Mexico State Police Officer Keene

---

* The Honorable Earl E. O'Connor, Chief Judge, United States District Court for the District of Kansas, sitting by designation.

testified that he noticed the car because its driver, Guzman, did not appear to be wearing his seat belt, a violation of the state's traffic regulations.

Officer Keene said that he followed the car for approximately three miles, pulling along side to confirm that the driver was not wearing a seat belt. He then pulled the car over. Guzman got out and approached the officer's cruiser, while his wife remained in the car. Officer Keene asked Guzman for his license and registration. Guzman gave the officer his license and informed him that the car was rented. They then returned to the car to retrieve the rental agreement.

Officer Keene asked Guzman why Hilario Lazo's name was on the agreement. Guzman explained that Lazo, his wife's uncle, had helped them rent the car because they did not have a major credit card of their own. Guzman also pointed out that he was an authorized driver. Officer Keene reviewed the rental agreement and driver's license, and concluded that both were in order. He then told Guzman that he had stopped him for a seat belt violation.

The officer admitted that at this point he had all the necessary information in connection with the violation. Rather than issue a warning or citation, however, he decided to conduct a further investigation. When asked to specify what he was investigating, Officer Keene said he was attempting to determine whether Guzman and Lazo were "hauling contraband in the vehicle." Rec., supp. vol. I, at 65.

Officer Keene began his supplemental investigation by again approaching defendants' car, allegedly to check the mileage. While he was comparing the odometer reading to the rental contract, Cruz–Lazo asked why they had been stopped. Officer Keene explained that Guzman had not been wearing his seat belt. He then asked a series of questions. Cruz–Lazo's replies were consistent with her husband's prior statement that they were en route from their home in Florida to vacation in Las Vegas. She also stated that they had saved $5000 for the trip.

Officer Keene testified that at the conclusion of his questioning of Cruz–Lazo, his suspicions were aroused. He explained that the noticeably pregnant Cruz–Lazo was perspiring and breathing heavily, while Guzman was not. The officer also testified that Cruz–Lazo seemed nervous and avoided making eye contact with him. Based upon these facts, Officer Keene decided to continue the detention. He proceeded to the rear of defendants' car where Guzman was waiting. He returned the rental contract, but retained Guzman's driver's license. While he began to write a warning for the seat belt violation, he continued his interrogation by asking Guzman numerous questions, including: whether his wife was employed, where he was headed, where he worked, when he got married, and if they were carrying any large sums of money. After completing the warning and handing it to Guzman, but without advising him that they were free to go, Officer Keene asked if they were carrying weapons or contraband. Guzman replied that they were not hiding anything, and that the officer was free to look.

Officer Keene then handed Guzman his driver's license and produced a consent to search form, which Guzman executed. The officer searched the trunk and found $5000 hidden in a shoe. He then searched the interior of the car and found a package of cocaine behind the rear seat.[1] Both defendants disclaimed any knowledge of the contraband. Officer Keene arrested defendants, and they were charged with possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982).

Defendants filed motions to exclude all evidence discovered pursuant to the traffic stop. The motions challenged the legality of the initial stop, the extent of the subsequent seizure and investigation, and the consent to search. After an evidentiary hearing, the court found that the officer's

---

**1.** Subsequent searches revealed approximately five kilograms of cocaine and $40,000 in cash behind the rear seat and the dashboard.

testimony lacked credibility and granted the motion on the ground that the seat belt violation was merely a pretextual justification for an otherwise unconstitutional stop on suspicion of drug possession. The court also concluded that even if the initial stop were legitimate, the officer's "conduct was entirely beyond reason." Rec., supp. vol. I, at 94. The court excluded all evidence discovered during the stop.

## II.

■ A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop. The classic example, presented in this case, occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity. Although no evidence contradicted Officer Keene's assertion that Guzman was not wearing his seatbelt, the district court found that his purpose in stopping defendants' car was to investigate criminal drug activity, an intrusion for which the officer did not have a reasonable suspicion. Based on the officer's subjective intent to stop defendants for an unrelated and insupportable reason, the court held the stop unconstitutional under the Fourth Amendment. The Government argues that if a driver violates a traffic law, a stop of his car can never be unconstitutional. We are thus presented with the question whether the constitutionality of a pretextual stop should be judged by a subjective or an objective standard.

■ Most circuits and commentators agree that an objective analysis of the facts and circumstances of a pretextual stop is appropriate, rather than an inquiry into the officer's subjective intent. *See, e.g., United States v. Causey,* 834 F.2d 1179, 1182 (5th Cir.1987) (en banc); *United States v. Miller,* 821 F.2d 546, 549 (11th Cir.1987) (applying *United States v. Smith,* 799 F.2d 704 (11th Cir.1986)); *United States v. Hawkins,* 811 F.2d 210, 213 (3d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 110, 98 L.Ed.2d 69 (1987); 1 W. LaFave, *supra,* § 1.4; Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 436–37 (1974). *But see United States v. Smith,* 802 F.2d 1119, 1124 (9th Cir.1986) ("whether an arrest is a mere pretext to search turns on the motivation or primary purpose of the arresting officers"). This court has also indicated that an objective approach is the correct one. *See Lessman v. McCormick,* 591 F.2d 605, 610 (10th Cir. 1979) (reasonable practice, not subjective purpose, governs).

■ The courts do not agree, however, on what objective elements are dispositive in determining whether a pretextual intrusion is unconstitutional. In *United States v. Smith,* 799 F.2d 704 (11th Cir.1986), a state trooper stopped a car that was weaving in its lane because he had a hunch that the vehicle was carrying drugs. Although the officer testified that he had not stopped the car because it was weaving, the Government on appeal contended that the stop was justified as either a valid traffic stop or as a stop to investigate drunk driving. The Eleventh Circuit held that "in determining when an investigatory [or traffic] stop is unreasonably pretextual, the proper inquiry ... is not whether the officer *could* validly have made the stop but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose." *Id.* at 709.

In *United States v. Causey,* 834 F.2d 1179 (5th Cir.1987) (en banc), a majority of the Fifth Circuit rejected the *Smith* test. In that case, police who wished to interrogate a bank robbery suspect based on less than probable cause discovered and used an outstanding arrest warrant arising from an unrelated petty offense. The dissent argued that the arrest was unconstitutional, citing *Smith* and pointing out that the police conduct at issue was so unprecedented that no reasonable officer would have undertaken the activity absent an invalid purpose. The majority held, to the contrary, that no unreasonable arrest occurs as long as the police "do no more than

they are objectively authorized and legally permitted to do." *Id.* at 1184.[2] Under the holding in *Causey,* therefore, a pretextual intrusion is constitutional as long as the pretext itself is lawful.

The pretext doctrine lies at the confluence of two distinct interests. An examination of a police officer's subjective intent in individual cases would unwisely involve the courts in unproductive inquiries. *See United States v. Arra,* 630 F.2d 836, 845 n. 12 (1st Cir.1980) (recognizing that officers may simply adopt the proper purpose as the basis for their action); Amsterdam, *supra,* at 436–37. Conversely, an objective test that asks no more than whether some set of facts might justify a given stop would permit arbitrary intrusions in situations such as traffic stops. Under such a test, thousands of everyday citizens who violate minor traffic regulations would be subject to unfettered police discretion as to whom to stop. To paraphrase one commentator, in the absence of standardized police procedures that limit discretion, whether we are simply allowed to continue on our way with a stern look, or instead are stopped and subjected to lengthy and intrusive interrogation when we forget to wear our seat belts, turns on no more than "the state of the digestion of any officer who stops us or, more likely, upon our obsequiousness, the price of our automobiles, the formality of our dress, the shortness of our hair or the color of our skin." Amsterdam, *supra,* at 416.

Such arbitrary action is unreasonable within the meaning of the Fourth Amendment. *See* 1 W. LaFave, *supra,* § 1.4(e), at 94–95. It is the need to restrain the arbitrary exercise of discretionary police power

that has been the driving force behind the Court's decisions forbidding police practices not amenable to objective review.[3] *See Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) ("When ... a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits."); *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979) ("[S]tandardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed"). Determining the constitutionality of intrusions by the prosecution's ability to justify them under some set of objective circumstances would undermine the Court's concern with limiting unreviewable discretion in the name of the objective test designed to safeguard that concern. Although requiring at least a minor traffic offense does provide some objective limitation on police intrusions,

> "given the pervasiveness of such minor offenses and the ease with which law enforcement agents may uncover them in the conduct of virtually everyone, [the requirement of a traffic violation] hardly matters, for ... there exists 'a power that places the liberty of every man in the hands of every petty officer,' precisely the kind of arbitrary authority which gave rise to the Fourth Amendment."

1 W. LaFave, *supra,* § 1.4(e), at 95 (quoting 2 L. Wroth & H. Zobel, *Legal Papers of John Adams* 141–42 (1965)).

Numerous Supreme Court cases recognize that such pretextual use of police power raises a problem of constitutional magni-

---

**2.** In his special concurrence in *Causey,* Judge Higginbotham expressed concern that "with the storage and retrieval capabilities of today's computers, warrants may function in a manner similar to the old general writs of assistance." 834 F.2d at 1186 (Higginbotham, J., specially concurring). Judge Higginbotham joined the majority because the arrest warrants were not "stored or 'warehoused' for a use other than to arrest for the offense charged in the warrants." *Id.* He did not share the dissent's concern that, absent improper motive, no objectively reasonable officer would have found and used the warrant.

**3.** We note that the decisions in *Scott v. United States,* 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978), and *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), often cited in the pretext context, did not emphasize the arbitrariness problem because it was not before the Court. No Fourth Amendment intrusion occurred in *Macon,* and the officers in *Scott* had a warrant. Thus, neither case involved a defendant whose Fourth Amendment rights were subject to the "discretion of the official in the field." *Almeida–Sanchez v. United States,* 413 U.S. 266, 270, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973).

tude. *See Steagald v. United States*, 451 U.S. 204, 215, 101 S.Ct. 1642, 1649, 68 L.Ed. 2d 38 (1981) (arrest warrant cannot justify entry into third party's home due to possibility that warrant may be used as pretext to search); *Colorado v. Bannister*, 449 U.S. 1, 4 n. 4, 101 S.Ct. 42, 44 n. 4, 66 L.Ed.2d 1 (1980) (per curiam) (no evidence traffic citation issued as pretext); *United States v. Robinson*, 414 U.S. 218, 238 n. 2, 94 S.Ct. 494, 494 n. 2, 38 L.Ed.2d 427 (1973) (Powell, J., concurring) (allegations of pretext would have created a different question); *id.* at 248, 94 S.Ct. at 482 (Marshall, J., dissenting) (pointing out that majority did not eliminate trial court's responsibility to determine that arrest was not a pretext to search); *Abel v. United States*, 362 U.S. 217, 226, 230, 80 S.Ct. 683, 692, 4 L.Ed.2d 668 (1960) (use of administrative warrant to search for evidence of criminal activity would be illegitimate); *Jones v. United States*, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 1257–58, 2 L.Ed.2d 1514 (1958) (purpose to search when no probable cause exists makes unconstitutional an otherwise arguably permissible search incident to arrest); *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932) ("An arrest may not be used as a pretext to search for evidence."). In addition to these direct statements on the issue, the Court has consistently recognized that pretextual use of exceptions to the normal Fourth Amendment requirements is problematic.[4] Thus, although the Court has never explicitly defined the contours of the pretext doctrine, precedent clearly suggests that the pretextual use of police power may violate the Fourth Amendment.

For these reasons, we believe the Eleventh Circuit has established the better test for determining whether an investigatory stop is unconstitutional: a court should ask "not whether the officer *could* validly have made the stop, but whether under the same circumstances a reasonable officer *would* have made the stop in the absence of the invalid purpose." *Smith*, 799 F.2d at 709.

"That an officer theoretically *could* validly have stopped the car for a possible traffic infraction [i]s not determinative. Similarly immaterial [i]s the actual subjective intent of the deputy. [A] stop [i]s unreasonable not because the officer secretly hope[s] to find evidence of a greater offense, but because it [i]s clear that an officer would have been uninterested in pursuing the lesser offense absent that hope."

*Id.*, at 710. In other words, "the proper basis of concern is not with *why* the officer deviated from the usual practice in this case but simply that he *did* deviate." 1 W. LaFave, *supra*, § 1.4(e), at 94. This test properly preserves the Supreme Court's requirement of an objective inquiry into Fourth Amendment activity, *see Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *Scott v. United States*, 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723–24, 56 L.Ed.2d 168 (1978), and provides meaningful judicial review of discretionary police action. *Accord* 1 La-Fave, *supra*, § 1.4(e).

The Government objects to any limitation on the exercise of police discretion to utilize minor violations to intrude where probable cause or reasonable suspicion does not otherwise exist, arguing that the police often

---

**4.** Two such exceptions are the plain view and inventory search doctrines. Although a majority of the Court has never agreed on the prerequisites needed to justify the admission of evidence discovered in plain view, an integral part of the established rule is that "the officer must discover incriminating evidence 'inadvertently' which is to say, he may not 'know in advance the location of [certain] evidence and intend to seize it,' relying on the plain view doctrine only as a pretext." *Texas v. Brown*, 460 U.S. 730, 737–38, 743, 103 S.Ct. 1535, 1541, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 470, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 564 (1971) (plu-

rality opinion)). Similarly, in approving warrantless inventory searches, the Court has consistently noted that no intent to search for evidence of a crime existed. *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 742, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 376, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976). As justification for the inventory search exception, Justice Powell has stated that "[i]nventory searches ... are not conducted in order to discover evidence of crime. The officer does not make a discretionary determination to search based on a judgment that certain conditions are present." *Id.* at 383, 96 S.Ct. at 3104 (Powell, J., concurring).

have no other means of enforcing the law. As Justice Scalia wrote for the Court in response to a similar argument, the officer is limited to "follow[ing] up his suspicions, if possible, by means other than a search.... It may well be that, in [some] circumstances, no effective means short of a search [or seizure] exist[s]. But there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 1155, 94 L.Ed.2d 347 (1987).

■ Contrary to the Government's argument, our approach will not "severely" curtail "the ability of the New Mexico State Police ... to enforce traffic laws." Brief of the Appellant—United States of America at 14. No prosecution for violation of a traffic regulation will be affected. Police officers may always issue appropriate citations to drivers who violate traffic regulations. Only evidence of a more serious crime discovered pursuant to such a stop will be excluded if the stop was unconstitutionally pretextual.

■ If police officers in New Mexico are required to and/or do routinely stop most cars they see in which the driver is not wearing his seat belt, then this stop was not unconstitutionally pretextual at its inception, even if Officer Keene subjectively hoped to discover contraband during the stop.[5] *Cf. United States v. Corral,* 823 F.2d 1389, 1392 (10th Cir.1987) (approving regularized road block stops of all cars), *cert. denied,* —— U.S. ——, 108 S.Ct. 2820, 100 L.Ed.2d 921 (1988). Conversely, if officers rarely stop seat belt law violators ab-

sent some other reason to stop the car, the objective facts involved in this stop suggest that the stop would not have been made but for a suspicion that could not constitutionally justify the stop.[6]

In this case, the district court conducted a subjective inquiry, which we conclude was inappropriate. The only information in the record reflecting general police practice was apparently based upon the district court's prior experience with this officer rather than testimony about general practices. We have neither the evidence nor the necessary findings about objective reasonableness to permit us to apply the appropriate test. We therefore turn to the district court's alternative holding that even assuming this stop was constitutional at its inception, it quickly exceeded its legitimate scope.

### III.

"[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. State of Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *see Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."); *Terry,* 392 U.S. at 17 & n. 15, 19–20, 28, 88 S.Ct. at 1877 & n. 15, 1878–79, 1883; *United States v. Lopez,* 777 F.2d 543, 548 (10th Cir.1985); *see also*

---

5. Supreme Court cases dealing with traffic stops approve of this view. When police discretion is limited by standardized procedures, the Court has approved limited warrantless intrusions. *See United States v. Martinez-Fuerte,* 428 U.S. 543, 556–60, 96 S.Ct. 3074, 3082–84, 49 L.Ed.2d 1116 (1976) (approving regularized checkpoints, which involve less discretion than roving patrols); *Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401. In situations where police discretion to stop virtually anyone creates the potential for abuse, however, the Court has held the practice unconstitutional without specific inquiry into whether the police actually abused their discretion. *See Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979); *see also Unit-*

*ed States v. Brignoni–Ponce,* 422 U.S. 873, 882, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975).

6. We adopted this analysis in *Lessman* where we said:

"It would be relevant to know whether the Topeka police, routinely or even occasionally, go to a person's home to make an arrest upon a violation for overtime parking. If this is never done unless there is a large accumulation of tickets, then although the warrant would be valid, it could still be an abuse of power."

591 F.2d at 611.

*United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983). The district court in this case held that even if the initial stop was not illegal, the subsequent detention was excessively intrusive.

■ Although "[v]ehicle stops for traffic violations occur countless times each day," *Prouse,* 440 U.S. at 659, 99 S.Ct. at 1399, "[t]here can be no question that the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment."[7] *Bannister,* 449 U.S. at 4 n. 3, 101 S.Ct. at 43 n. 3. The mere stopping of a car is ordinarily a limited seizure. *See United States v. Gonzalez,* 763 F.2d 1127, 1130 n. 1 (10th Cir.1985); *see also Berkemer v. McCarty,* 468 U.S. 420, 437–38, 104 S.Ct. 3138, 3148–49, 82 L.Ed.2d 317 (1984) (holding traffic stop more analogous to an investigative detention than a custodial arrest for *Miranda* warning purposes). Moreover, New Mexico does not permit custodial arrest for violation of its seat belt regulation. N.M.Stat.Ann. 66–7–372; 66–8–122(F); 66–8–123 (1987). Thus, the encounter here was analogous to a *Terry* stop.

■ An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. *Gonzalez,* 763 F.2d at 1130; *United States v. Recalde,* 761 F.2d 1448, 1455 (10th Cir.1985). When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning. *Cf. Gonzalez,* 763 F.2d at 1130; *Recalde,* 761 F.2d

at 1455; *Palmore v. United States,* 290 A.2d 573, 583 (D.C.1972), *aff'd on other grounds,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). In order to justify "a temporary detention for questioning," the officer must also have reasonable suspicion "of illegal transactions in drugs or of any other serious crime." *Royer,* 460 U.S. at 498–99, 103 S.Ct. at 1324.

■ In this case, the officer asked for and received a proper license and registration. *Cf. United States v. Obregon,* 748 F.2d 1371, 1376 (10th Cir.1984) (continued detention justified when car rented in another's name, driver not listed as authorized operator, and driver unable to provide means of contacting lessee). No objective circumstances suggested that Guzman or Cruz–Lazo had committed any crime more serious than failure to wear their seat belts. After the officer confirmed that the car was not stolen and that Guzman had a valid driver's license, his authority was limited by both state law and the Fourth Amendment to issuing a citation or warning. Without returning Guzman's license, however, the officer approached the car ostensibly to check the odometer, and began questioning Cruz–Lazo. Absent reasonable suspicion, an officer has no legitimate reason to check a car's odometer, and he certainly may not conduct what the district court described as "intrusive questioning, that I think any of us would find offensive if it were undertaken by even a best friend, much less a police officer on the highway at eight-thirty in the morning."[8] Rec., supp. vol. I, at 92.

---

7. Although exceptions to normal Fourth Amendment requirements exist for automobiles, " '[t]he 'grave danger' of abuse of discretion does not disappear simply because the automobile is subject to state regulation resulting in numerous instances of police-citizen contact." *Prouse,* 440 U.S. at 662, 99 S.Ct. at 1400 (citations omitted). "[S]topping an automobile and detaining its occupants constitute a 'seizure' ... even though the purpose of the stop is limited and the resulting detention quite brief." *Id.* at 653, 99 S.Ct. at 1396; *see United States v. Almeida–Sanchez,* 413 U.S. 266, 269, 93 S.Ct. 2535, 2537, 37 L.Ed.2d 596 (1973) ("Automobile or no automobile, there must be probable cause for the search.").

8. The Government stresses that this traffic stop took less than fifteen minutes. As the Supreme Court made clear in *United States v. Sharpe,* 470 U.S. 675, 685–87, 105 S.Ct. 1568, 1574–76, 84 L.Ed.2d 605 (1985), the basis for and the circumstances surrounding the stop, rather than an arbitrary time limit, govern the stop's permissible length. Although the stop in this case may well have been of short duration, it nevertheless unreasonably extended beyond the length necessary for its only legitimate purpose—the issuance of a warning or citation for a seat belt violation.

 At the suppression hearing, Officer Keene attempted to articulate his suspicions by pointing to Cruz–Lazo's demeanor and her responses to his questions. However, nothing he learned during his investigation created reasonable suspicion to justify a *Terry*-type detention. He claimed that Cruz–Lazo looked sick, seemed apprehensive, was sweating considerably, and did not look him in the eye. He noted that Guzman seemed cool throughout the encounter. He also thought that a laborer and his wife could not have saved $5000 (or $4000 as Guzman stated) for a vacation. Even if such factors might create a reasonable suspicion of something in the appropriate circumstances, they could not do so here. Cruz–Lazo was a noticeably pregnant woman, sitting in a car with the engine off in the middle of the desert several thousand miles from her home. She and her husband had just been stopped and were being questioned extensively because her husband had failed to wear his seat belt. Under the circumstances, her actions do not arouse objective suspicion. Furthermore, Officer Keene was unjustified in assuming that a laborer and his wife could not possess $5000 without arousing suspicion *sufficient to justify a seizure.* That Officer Keene's " 'hunch' about [defendants] proved correct is perhaps a tribute to his policeman's intuition, but it is not sufficient to justify, *ex post facto*, a seizure that was not objectively reasonable." *Smith,* 799 F.2d at 708.

## IV.

The Government argues alternatively that Guzman's consent legitimized the search of the car. However, the district court made no findings on the issue of consent, which is a question of fact. *See Schneckloth v. Bustamonte,* 412 U.S. 218,

227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). We therefore must remand for that purpose. First, however, we set out the standards to be applied on remand.

 This Circuit has held that when a consent to search is preceded by a Fourth Amendment violation, the consent is valid only if it is voluntary in fact.[9] *United States v. Carson,* 793 F.2d 1141, 1151 (10th Cir.1986). A determination whether a particular consent is voluntary in fact is made by examining the totality of the circumstances surrounding the consent. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59; *Carson,* 793 F.2d at 1149.

In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court held that where a confession is preceded by a Fourth Amendment violation, in determining the voluntariness of the confession the examining court must decide whether it was " 'sufficiently an act of free will to purge the primary taint' [of the illegal arrest]." *Id.* at 601, 95 S.Ct. at 2260 (quoting *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)). Although the Court acknowledged that a determination of this issue is necessarily a complex one in which "no single fact is dispositive," *id.* 422 U.S. at 603, 95 S.Ct. at 2261, it placed special emphasis on three factors: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct are all relevant." *Id.* at 603–04, 95 S.Ct. at 2261–62 (citation omitted). In applying the *Schneckloth* voluntariness test to consents to search obtained subsequent to Fourth Amendment violations, this Court has employed these same three *Brown* factors. *See Carson,* 793 F.2d at 1152 ("The factors articulated in

---

9. Voluntariness in fact under the Fourth Amendment is contrasted with Fifth Amendment voluntariness. In *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court was faced with a confession given while the defendant was illegally detained. The Court held that even if the confession were "voluntary under the Fifth Amendment" because the defendant received *Miranda* warnings, the issue remained whether it was voluntary under the Fourth Amendment. *Id.* at 601–02, 95 S.Ct. at 2260–61. In *Carson v. United States,* 793 F.2d 1141, 1150–51 (10th Cir.1986), we noted that in examining the voluntariness of a consent to search, the legal requirements of the Fifth Amendment were inapplicable. The sole issue in such a case is whether the consent is voluntary in fact, in light of the totality of surrounding circumstances. *Id.* at 1151.

*Brown v. Illinois* are examples of the kinds of facts which a court should consider ... to bring defendant's consent within Fourth Amendment voluntariness standards"); *United States v. Recalde,* 761 F.2d 1448, 1458 (10th Cir.1985). *Recalde* is virtually identical to the present case in relevant factors, as well as geographic detail, and we applied the *Brown* factors to analyze the voluntariness of a consent to search an automobile, which was given after an illegal detention. *Id.* at 1458.

■ The court below made no findings as to the voluntariness of the consent in this case. Voluntariness is a finding of fact, to be determined under the totality of the circumstances. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047. It is "not the function of the appellate court to try the facts or substitute for the trial court in the determination of factual issues." *Sabol v. Snyder,* 524 F.2d 1009, 1011 (10th Cir. 1975). This is particularly true where, as here, the credibility of witnesses is important on the issue of voluntariness.[10] We therefore remand to the district court for further fact-finding on the voluntariness issue. On remand, in deciding whether the Government has met its burden of proving voluntariness in fact, *see Schneckloth,* 412 U.S. at 222, 93 S.Ct. at 2045; *Carson,* 793 F.2d at 1150, the district court should examine the totality of the circumstances surrounding Guzman's conduct, focusing on the temporal proximity of the illegal stop and the consent, any intervening circumstances, and the purpose and flagrancy of Officer Keene's misconduct.

The judgment below is vacated, and the case is remanded for proceedings consistent with this opinion.

---

10. Where the proceeding below "resulted in a record of amply sufficient detail and depth from which the determination may be made," the appellate court may conduct this analysis. *Brown v. Illinois,* 422 U.S. at 604, 95 S.Ct. at

2262. In this case, however, we feel unqualified to step into the shoes of the trier of fact and evaluate the testimony of the single witness that constituted the record in this case.