937 F.2d 603
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David Garfield BURNEY, Defendant-Appellant.
 No. 90-5720.
 United States Court of Appeals, Fourth Circuit.
 Argued June 7, 1991.
Decided July 15, 1991.
As Amended Aug. 20, 1991.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. James C. Fox, Chief District Judge. (CR-90-4)
 Elizabeth Manton, Assistant Federal Public Defender, Raleigh, N.C. (Argued), for appellant; Jeffrey L. Starkweather, Assistant Federal Public Defender, Raleigh, N.C., on brief.
 Scott Larison Wilkinson, Jr., Assistant United States Attorney, Raleigh, N.C. (Argued), for appellee; Margaret Person Currin, United States Attorney, Raleigh, N.C., on brief.
 E.D.N.C.
 AFFIRMED.
 Before PHILLIPS and NIEMEYER, Circuit Judges, and ROBERT R. MERHIGE, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 David Garfield Burney appeals from his conviction for possession of a firearm by a convicted felon in violation of 18 U.S.C. Sec. 922(g)(1), following the entry of a conditional plea of guilty. Burney argues that the district court erroneously denied his motion to suppress. Finding no error, we affirm.
 
 
 2
 * During the early evening hours of October 3, 1989, Burney and his friend, Alphonso Lee, installed a new clutch in a 1978 Datsun which was owned by Burney's cousin Major Peterson. After Burney and Lee finished the job, Peterson allowed the two men to borrow the car in order to give a friend a ride home and to have the car washed. Peterson gave the car keys to Lee, rather than to Burney, because he knew that Burney did not have a driver's license.
 
 
 3
 After dropping off their friend at his home, Lee and Burney, the front seat passenger, proceeded to a car wash located on Highway 211. As Lee turned the car from Highway 701 onto Highway 211, he saw two highway patrol cars. At the same time, Trooper Dixon was observing the Datsun as it turned right onto Highway 211 and passed the trooper on the driver's side of his vehicle. Trooper Dixon noticed that Lee was not wearing his seat belt.[1] Trooper Dixon then turned his car around and followed the Datsun.
 
 
 4
 When Lee saw blue lights flashing behind him he turned right into the driveway of a car wash which was along the highway, and pulled into the entrance of a well-lit bay. Located to the left of the driver's side of the Datsun in this position was a laundromat.
 
 
 5
 Trooper Dixon followed the Datsun and parked his patrol car directly behind it. Trooper Christianson, who was also in the area, arrived shortly thereafter and parked his patrol car on the other side of the car wash bay, blocking the Datsun's forward exit.
 
 
 6
 After the vehicles came to a stop, Trooper Dixon approached the driver's side of the Datsun and asked Lee to produce his license, which he did. The trooper then asked Lee to accompany him to the patrol car. The trooper testified at the suppression hearing that he detected an odor of alcohol as Lee got out of the Datsun.
 
 
 7
 The trooper and Lee then seated themselves in the front seat of the patrol car. Trooper Dixon did not administer any field sobriety tests, nor did he perform a pat down search of Lee, who denied that he had been drinking that evening.
 
 
 8
 Meanwhile, Burney remained in the passenger seat of the Datsun with Trooper Christianson standing next to his door. With the trooper's permission Burney left the car to go to the bathroom in the laundromat. Trooper Christianson then approached Trooper Dixon's patrol car, at which point Dixon asked him to search the Datsun. At the hearing Trooper Dixon maintained that prior to its instigation, Lee consented to a search of the car for alcoholic beverages. Lee, however, maintained, that it was not until after Trooper Christianson had begun the search that Trooper Dixon asked him whether he had a problem with the search. Lee then consented to the search, although he testified that he did not feel authorized to refuse, since it had already begun.
 
 
 9
 Trooper Dixon did not read Lee his Miranda rights, nor did he inform him that he had a right not to consent to the search.
 
 
 10
 During the search of the car, Trooper Christianson discovered a .44 caliber magnum revolver under the front passenger seat where Burney had been seated. Trooper Dixon immediately joined Christianson. While the officers stood near the front passenger side of the car examining the gun, Trooper Dixon saw Burney come out of the laundromat. From a distance of less than 15 feet, Trooper Dixon saw Burney drop a metallic object into a trash can. A search of the trash can revealed a loaded .25 caliber semi-automatic pistol.
 
 
 11
 Burney and Lee were subsequently handcuffed, placed under arrest, and seated in Trooper Dixon's patrol car. Trooper Dixon informed them that he was not going to read them their Miranda rights until they were in front of the magistrate, but that he would also not ask them any questions. Nevertheless, as the two officers attempted to unload the pistol, Burney spontaneously shouted that both guns belonged to him and not to Lee. He then explained to the officers how to unload the gun.
 
 
 12
 Although the two men were subsequently brought to the police station, Lee was not given a citation for the seat belt violation, nor was he charged with driving under the influence of alcohol. The arrest form contained no mention of Trooper Dixon's suspicion that Lee had been drinking, no mention of the basis for the search of the Datsun, and no mention of Lee's purported consent to the search.
 
 
 13
 Burney was ultimately indicted on two separate charges of possession of a firearm by a convicted felon, in violation of 18 U.S.C. Sec. 922(g)(1). A suppression hearing was held, at the conclusion of which the district court denied Burney's motions. The court found: (1) that the initial stop was lawful; (2) Burney lacked standing to challenge the legality of the search of the car; and (3) even assuming Burney had standing and that the search was illegal, the second handgun and the statements made by appellant were not "fruits" of that unlawful search.
 
 
 14
 On July 2, 1990, Burney entered a plea of guilty to both counts, pursuant to a plea agreement. He reserved his right to appeal the denial of his suppression motion. This appeal followed.
 
 II
 
 15
 Burney's first contention is that the Datsun was unlawfully stopped without a reasonable and articulable basis and that the seatbelt justification was merely pretextual. It is axiomatic that an officer must have a "reasonable and articulable" basis before stopping a vehicle for investigatory purposes. See Terry v. Ohio, 392 U.S. 1 (1967). In this situation the purported reason for making the stop was not to investigate, but rather to issue a citation for an unlawful act, failure to wear a seatbelt. This lawful justification for the traffic stop does not necessarily render it constitutionally permissible if the officers used the legal justification as a "pretext" to search the car for evidence of an unrelated crime for which they do not otherwise have the reasonable suspicion necessary to support the stop. See United States v. Trigg, 878 F.2d 1037 (7th Cir.1989); United States v. Guzman, 864 F.2d 1512 (10th Cir.1988); United States v. Nersesian, 824 F.2d 1294 (2d Cir.1987), cert. denied, 484 U.S. 957 (1987).
 
 
 16
 In determining whether a stop was pretextual, most courts agree that an objective analysis of the facts and circumstances of the stop is more appropriate than an inquiry into the subjective intent of the officers involved. See, e.g., United States v. Guzman, 864 F.2d 1512 (10th Cir.1988); United States v. Causey, 834 F.2d 1179 (5th Cir.1987) (en banc). There is disagreement, however, on what objective elements are relevant. Some courts have held that the reasonableness of a stop depends upon whether the officer had probable cause to believe that the defendant had committed or was committing an offense and whether the officer was authorized by state or local law to act as he did. See United States v. Trigg, 878 F.2d 1037 (7th Cir.1989); United States v. Causey, 834 F.2d 1179 (5th Cir.1987) (en banc). In other words, these courts have held that the stop is not pretextual so long as the officer does "no more than [he] is objectively authorized and legally permitted to do." Causey, 834 F.2d at 1184.
 
 
 17
 Other courts, including the Tenth and Eleventh Circuits, have rejected this approach in favor of a more rigorous analysis. For these courts the focus is not "whether the officer could validly have made the stop but whether under the same circumstances a reasonable officer would have made the stop in the absence of the invalid purpose." United States v. Guzman, 864 F.2d 1512, 1517 (10th Cir.1988); see also United States v. Smith, 799 F.2d 704 (11th Cir.1986). If the officers are authorized to stop cars and routinely do so, the stop is presumptively valid. Guzman, 864 F.2d at 1512.
 
 
 18
 The evidence introduced at the suppression hearing would support the validity of the stop under either of these two approaches. As the district court found, the stop was based on probable cause to believe that the driver of the vehicle was not wearing his seatbelt which, if true, would constitute a violation of the traffic laws of the state. Trooper Dixon testified without contradiction that he observed Lee at a short distance as he turned onto Route 211 and saw that he was not wearing his seatbelt. Lee himself admitted during the suppression hearing that he had not been wearing his seatbelt. In stopping the vehicle the officer was doing no more than he was objectively authorized and legally permitted to do. See N.C.Gen.Stat.Section 20-135.2A (drivers of passenger vehicles must wear safety belts).
 
 
 19
 Further, there was substantial evidence that the highway patrol made a regular practice of enforcing the seatbelt law. Trooper Dixon testified that he had issued approximately 32 citations for failure to wear a seatbelt during a three-month period in 1990. Trooper Christianson testified that during the same three-month period he had issued approximately 80 citations for failure to wear a seat-belt. Other officers testified to the general policy of District Five of Troop B, of which these two Troopers were members.
 
 
 20
 In the absence of any evidence of pretextual motivation, and in view of the accepted practice of enforcing the seatbelt law, we conclude that the initial stop of the vehicle was lawful and justified.[2]
 
 III
 
 21
 Burney also maintains that the search of the Datsun was in violation of the Fourth Amendment as it was undertaken without probable cause or consent. This raises two issues: whether the appellant has standing to challenge the search and, if so, whether the search of the vehicle was, in fact, unlawful or unreasonable. As for the latter, the United States has heretofore relied solely on the consent of the driver as the basis for the search. The United States conceded that in the absence of a valid consent the search was unreasonable.
 
 
 22
 The district court concluded that Lee's consent, if given at all, was not voluntary. The court's decision was based on its finding that the consent was obtained in a "coercive atmosphere" and by the fact that Trooper Dixon did not inform Lee of his right to refuse a consensual search. On appeal the United States has not contested the district court's findings in this regard. Therefore, the sole question before us is whether Burney has standing to object to the search.
 
 
 23
 In order to obtain standing a party must show that the search and seizure violated his personal Fourth Amendment right to a legitimate expectation of privacy in the particular area searched. Rakas v. Illinois, 439 U.S. 128 (1978). Ownership or possession of an item seized is insufficient in itself to establish a right to a legitimate expectation of privacy in the particular area searched. United States v. Manbeck, 744 F.2d 360, 374 (4th Cir.1984), cert. denied, 469 U.S. 1217 (1985); United States v. Ramapuram, 632 F.2d 1149, 1154 (4th Cir.1981), cert. denied, 450 U.S. 1030 (1981) (ownership alone not sufficient to establish reasonable and legitimate expectation of privacy).
 
 
 24
 A legitimate expectation of privacy depends upon two factors: whether the defendant has manifested a subjective expectation of privacy in the particular area searched and whether society is prepared to recognize this expectation of privacy as objectively reasonable. See California v. Greenwood, 486 U.S. 35 (1988); Rakas v. Illinois, 439 U.S. 128 (1978). The burden of establishing these factors is on the defendant. Rakas, 439 U.S. at 134.
 
 
 25
 Factors relevant to the determination of the defendant's subjective expectation of privacy in the particular area searched include ownership of the items seized, United States v. Salvucci, 448 U.S. 83, 92 (1980), evidence of the defendant's desire to keep the items seized private, United States v. Paulino, 850 F.2d 93, 96 (2d Cir.1988), cert. denied, 490 U.S. 1052 (1989), and the defendant's presence or absence at the time of the search. See United States v. Torch, 609 F.2d 1088 (4th Cir.1979), cert. denied, 446 U.S. 957 (1980).
 
 
 26
 The cases cited above also set out the relevant factors for determining whether the subjective expectation of privacy by a non-owner passenger is objectively reasonable. These include an assertion by the passenger of a property or possessory interest in the vehicle and in the area searched, whether the passenger drove the vehicle or had permission from the driver or owner of the vehicle to drive the vehicle, whether the owner gave the passenger permission to place or store his personal property in the vehicle, whether the passenger possessed keys to the vehicle or had ever used the vehicle on prior occasions, and whether he had a right to exclude others from the vehicle.
 
 
 27
 Beginning with the subjective expectation, it is undisputed that Burney owned the gun seized. Therefore, although there was no evidence at the hearing as to how and when the gun was placed under the seat and who placed it there, the strong inference is that Burney, who was also the front seat passenger, placed it there for safe keeping. On the other hand, the fact that Burney remained absent for some period of time until after the search was completed diminishes his claimed subjective expectation of privacy. Assuming for the moment that Burney did manifest a subjective expectation of privacy, we nevertheless conclude that this expectation was not objectively reasonable. Although the evidence indicates that Burney was present in the car with the permission of the owner, this fact is "not determinative of whether ... [he] had a legitimate expectation of privacy in the particular areas of the automobile searched." Rakas v. Illinois, 439 U.S. 128, 148 (1978). The determinative issues are whether Burney had a property or possessory interest in the car, or by virtue of his ownership, or lawful possession or control of the property, had the right to exclude others from the property. Id.
 
 
 28
 Burney relies heavily on the fact that he and Lee were jointly given the car. He cites United States v. Kye Soo Lee, 898 F.2d 1034 (5th Cir.1990), in which the Fifth Circuit found that both the driver and passenger of a Ryder rental truck had standing to challenge the search of the truck's cargo hold even though neither of them had rented the truck, had claimed ownership of the content or had admitted to having the ability to unlock the cargo area.
 
 
 29
 What distinguishes this case from the present one is that the passenger in Kye Soo Lee had originally been hired to drive the vehicle and possessed a valid driver's license. Id. at 1037-38. There is no evidence before this Court that Burney had permission to drive or direct the use of the car. Nor is there evidence that Burney had the owner's permission to store his personal items in the car, or even that he had used the car on prior occasions. Further, the record adequately supports the district court's conclusion that Burney's presence in the vehicle was for the temporary, limited purpose of accompanying Lee to take a friend home and go to a car wash.
 
 
 30
 We therefore agree that Burney has failed to establish an objectively reasonable expectation of privacy. In view of this conclusion we find it unnecessary to address Burney's suggestion that the .25 caliber semi-automatic pistol seized from the trash can and his subsequent statements were inadmissible "fruits" of an unlawful search of the car. The decision of the district court is therefore
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 At the suppression hearing Lee admitted that he had not been wearing his seatbelt
 
 
 [2]
 In his original appellate brief Burney also argued that the evidence seized and the statement obtained as a result of the initial stop must be suppressed under United States v. Cartledge, 742 F.Supp. 291 (M.D.N.C.1990). The court there held that the fruits of a search conducted by the Highway Patrol, pursuant to a seat belt stop, had to be suppressed pursuant to N.C.Gen.Stat.Section 20-135.2A. This statute prohibits the admission of evidence of failure to wear a seat belt in any proceeding except in an action based on a violation of that section
 Since the filing of this brief, Cartledge has been reversed by this Court, which held that testimony concerning seat belt violations is admissible in federal criminal actions. United States v. Cartledge, 928 F.2d 97 (4th Cir.1991). The argument is therefore rendered moot.