989 F.2d 508
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellees,
v.
Sergai Stani MARS; Elizabeth Diane Hoskins, also known as
Judith Lea, also known as Elizabeth Diane
Williams, Defendants-Appellants.
 Nos. 92-2081, 92-2111.
 United States Court of Appeals, Tenth Circuit.
 March 25, 1993.
 
 Before McKAY, Chief Judge, MOORE and ANDERSON, Circuit Judges.
 ORDER AND JUDGMENT*
 STEPHEN H. ANDERSON, Circuit Judge.
 
 
 1
 Appellants, Elizabeth Diane Hoskins and Sergai Stani Mars, entered conditional guilty pleas to possessing with the intent to distribute more than one hundred kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2. Each was sentenced to a term of sixty months' imprisonment followed by four years of supervised release. Prior to entering guilty pleas, both Hoskins and Mars moved to suppress evidence (approximately 200 kilograms of marijuana) seized from a truck driven by Hoskins, contending that the police lacked probable cause or reasonable suspicion to justify the stop of Hoskins' vehicle. The court found that there was reasonable articulable suspicion of criminal activity which justified the stop and that, in any event, Mars lacked standing to challenge the stop. On appeal, both Hoskins and Mars reassert their positions that there was no legitimate basis for the stop of the vehicle, and Mars challenges the court's ruling that he did not have standing.[1] We affirm.
 
 FACTS
 
 2
 Following a hearing on Hoskins' and Mars' motions to suppress, the district court made extensive findings of fact. The pertinent part of these findings, plus certain other facts of record which we deem to be essentially undisputed, are as follows.
 
 
 3
 On the morning of September 30, 1991, a Bureau of Land Management ("BLM") employee, Don Peterson, accompanied by two other BLM employees, was driving a BLM pickup truck in the foothills of the Guadalupe mountains, a remote area in southeastern New Mexico.[2] The three employees were on their way to work at a wildlife project under construction at the time. R.Vol. II, Tr. at 42-43. While driving along an unimproved roadway toward the wildlife project, Peterson and his companions noticed a low flying aircraft, estimated to be about 100 feet off the ground. The airplane disappeared behind a hill and looked as if it was about to land, although no landing gear was visible. Id. at 44-45. When it reemerged from behind the hill, it was "traveling very fast, [taking] a more or less southerly direction ... over the Guadalupe escarpment." Id. at 44.
 
 
 4
 Peterson testified at the suppression hearing that the plane's movement and presence in that area struck him as "very peculiar." R.Vol. II, Tr. at 45. He had never seen a small aircraft such as this flying in that area before, and the fact that it was flying so low was "certainly hazardous." Id. at 45-48. The nearest ranch from their location was located approximately three miles to the east. Peterson knew the personnel at the ranch and knew that they did not own or operate an airplane. There was no landing strip in the area. Id. at 46-48. Peterson testified that, based on his 30 second observation of the aircraft, he "suspected that it was a drug drop and got concerned about [their] safety." Id. at 48. He immediately radioed the dispatcher in Carlsbad to report the incident. Id. at 49. BLM Ranger Walter Hutte told Peterson to leave the area at once. Peterson turned the truck around and headed back along the unimproved road. Id. at 48-49.
 
 
 5
 As the truck neared the intersection of the unimproved road and the county-maintained road (Armstrong Road), Peterson observed a tan pickup truck with a camper shell travelling along Armstrong Road to the northwest of the hill behind which the aircraft had briefly disappeared moments before. R.Vol. II, Tr. at 53-57. Peterson testified that the vehicle "just didn't somehow fit into the area...." Id. at 59. It was travelling at a relatively high rate of speed for the condition of the road, which was bladed and "gravely." Id. at 54. Moreover, the truck was clean and in good condition, not "banged up" and outfitted with a toolbox or headache rack like most ranch and hunting vehicles typically seen in the area. Id. at 58. Because the vehicle was headed in the same direction from which the aircraft was last observed, Peterson's suspicions about a drug drop were heightened, and he radioed Hutte a second time to pass on information about the tan pickup truck. Id. at 59-60.
 
 
 6
 Hutte instructed Peterson to get to a location where it would be possible to further observe the pickup truck. R.Vol. II, Tr. at 61. Peterson parked on a hill on Armstrong Road and he and his companions saw "dust or a trail or cloud coming out from the vehicle, and it was coming out [along Armstrong Road] a lot faster than it went in [along Armstrong Road]." Id. at 62. As the truck passed them, Peterson was able to observe the license plate number as well as the driver, a dark haired woman wearing sunglasses. He also noted that the bed of the truck, under the camper shell, appeared to contain some cargo. R.Vol. II, Tr. at 66. He again radioed Hutte to pass along this information. Id. at 77.
 
 
 7
 Meanwhile, Hutte contacted other law enforcement officials in his Roswell office. He also contacted the United States Customs Service to get its assistance in locating the aircraft, and the Eddy County Sheriff's Office to ascertain that the plane did not belong to the county. R.Vol. II, Tr. at 76-77. Hutte knew that the area of the sighting contained no power lines or recent oil activity that might explain a low flying plane belonging to a utility or energy company. Id. When Peterson radioed information about the vehicle, Hutte relayed that information to the Eddy County Sheriff's Office. Id. at 79-80.
 
 
 8
 Hutte, like Peterson, suspected a drug drop. In addition to the unusual circumstances reported by Peterson, Hutte was aware of recent DEA intelligence reports of drug trafficking in the area. Further, he was personally investigating reports of marijuana being cultivated in the nearby canyons. Id. at 76, 81-82. Hutte, now on his way to the scene, conveyed his suspicions and the need for assistance to the Eddy County Sheriff's Office. In response, Deputy Eddie Markham set out to cover points of egress from the area where the tan truck was last reported. He positioned his patrol car at the intersection of White Pine Road and U.S. Highway 285. Id. at 91-95.
 
 
 9
 Deputy Markham had received radio reports of the morning's events and a description of the tan truck, its driver and its license plate number. Seeing the truck approaching, Markham activated his emergency lights and motioned for the truck to pull over, which it did. He approached the truck on foot and asked the driver for her driver's license. The driver, later identified as appellant Elizabeth Hoskins, produced a California identification card bearing the name of "Judith Lea." She explained that she had lived in Roswell, New Mexico for a short time and had not had an opportunity to obtain a New Mexico driver's license. At this point, Deputy Markham smelled the odor of marijuana emanating from the vehicle. He asked Hoskins for permission to search the vehicle, which she granted. Markham found a number of marijuana bales in the bed of the truck. R.Vol. II, Tr. at 92-97. Hoskins was arrested on the scene.
 
 
 10
 The next day, with Hoskins' cooperation and assistance, the police kept Mars under continuous surveillance in Roswell, New Mexico. He was observed driving a Ryder truck to Hoskins' apartment, backing the truck up to the garage door, and loading the bales of marijuana into the truck. Shortly after leaving Hoskins' residence, Mars was arrested. Later the same day, a search warrant was obtained and executed on the Ryder truck. Mars' Presentence Report, R.Vol. III at 4.
 
 DISCUSSION
 
 11
 When we review a district court's denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and we consider the evidence in the light most favorable to the district court's ruling. United States v. Nicholson, No. 92-3083, 1993 WL 538, at * 2 (10th Cir. Jan. 5, 1993). However, the ultimate determination of reasonableness under the Fourth Amendment is a conclusion of law which we review de novo. Id.
 
 1. Mars' Standing
 
 12
 Mars contests the district court's determination that he lacked standing to challenge the investigatory stop of Hoskins' vehicle. He argues that "where a joint and covert operation is involved as shown by the record, a reasonable expectation of privacy exists on the part of those jointly involved in the successive facets of the operation." Brief of Appellant [Mars] at 10. When, as here, the operative facts are undisputed, we review the question of standing de novo. United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir.1990); United States v. Leary, 846 F.2d 592, 595 (10th Cir.1988).
 
 
 13
 In order to challenge the lawfulness of a search and seizure, a defendant must first establish his or her standing to do so by demonstrating a "legitimate expectation of privacy" in a particular place and that this expectation was violated by the search and seizure. Rakas v. Illinois, 439 U.S. 128, 143 & n. 12 (1978). Standing is not conferred vicariously; "Fourth Amendment rights are personal and [a] defendant cannot claim a violation based on the introduction of evidence obtained through an illegal search and seizure of a third person's property." United States v. Abreu, 935 F.2d 1130, 1132 (10th Cir.) (citing Rakas, 439 U.S. at 133-34), cert. denied, 112 S.Ct. 271 (1991). Thus, a defendant bears the burden of proving that the challenged search or seizure infringed on his or her personal Fourth Amendment interests. Rakas, 439 U.S. at 130 n. 1; United States v. Erwin, 875 F.2d 268, 270 (10th Cir.1989).
 
 
 14
 When analyzing a person's standing to challenge the search or seizure of a vehicle, we inquire "whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' " and "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable." ' " Smith v. Maryland, 442 U.S. 735, 740 (1979) (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)); see also Abreu, 935 F.2d at 1132; United States v. Arango, 912 F.2d 441, 445 (10th Cir.1990). The expectation of privacy must be demonstrated in the area searched, not merely in the items seized. United States v. Skowronski, 827 F.2d 1414, 1418 (10th Cir.1987) (citing United States v. Salvucci, 448 U.S. 83, 93 (1980)).
 
 
 15
 Mars urges us to employ the so-called "joint venture" exception to the Rakas rule which allows one exercising joint control and supervision over a place searched to claim standing to challenge the search of another's premises. See United States v. Broadhurst, 805 F.2d 849, 851-52 (9th Cir.1986) (citations omitted). We decline to do so.
 
 
 16
 Mars failed to introduce any evidence at the suppression hearing to show ownership, possession or control of the tan pickup truck which might establish a legitimate expectation of privacy in the particular area searched. See Rakas, 439 U.S. at 148-49; Erwin, 875 F.2d at 271. The vehicle was driven by Hoskins and registered to a man using the alias Steven Brown. Mars was not a passenger in the truck, nor was he the owner, nor did he rent the vehicle. He offered no evidence to indicate that he was anywhere near the vehicle when the morning's events took place, or that he even knew the marijuana was being transported in the truck. The evidence presented at the suppression hearing reveals nothing more than Mars' "mere membership in a criminal venture." United States v. Lockett, 919 F.2d 585, 588 (9th Cir.1990). Complicity in criminal activity, without more, does not give Mars a reasonable expectation of privacy in the property used in connection with the criminal venture. Id. Because Mars did not sustain his burden of showing a legitimate expectation of privacy, the district court correctly found that Mars lacked standing to challenge the investigatory stop of the truck driven by Mars.
 
 2. The Investigatory Stop of Hoskins' Truck
 
 17
 Next, Hoskins asserts that Deputy Markham's investigatory stop of the vehicle was not founded on a reasonable suspicion of criminal activity.[3] To determine whether an investigatory stop is justified, the detaining officer must take into account the totality of circumstances, Alabama v. White, 496 U.S. 325, 330 (1990), and the officer may rely on the collective knowledge or representations of other law enforcement officials to form the basis of suspicion. United States v. Hensley, 469 U.S. 221, 232 (1985). Thus, although the officer issuing instructions or orders to other officers must have a reasonable suspicion to justify a stop, "the officer who acts in reliance on the [information] is not required to have personal knowledge of the evidence creating the reasonable suspicion." Id. at 231.
 
 
 18
 Hoskins argues that the "inconsistencies and contradictions in the content of communications between [Peterson, Hutte and Markham] reveal the unfounded nature" of Deputy Markham's investigatory stop of Hoskins' vehicle. Appellant's Opening Brief at 17. Due to a malfunction of his radio, Hutte was unable to communicate directly with Deputy Markham; instead, he was forced to relay information to Markham and the Eddy County Sheriff's Office through the BLM radio dispatcher who then telephoned the sheriff's office. R.Vol. II, Tr. at 79. Moreover, Hoskins asserts that "Ranger Hutte did not personally observe the factual basis for [his] purported reasonable suspicion," Appellant's Opening Brief at 17, and that Peterson provided Hutte an "insufficient basis to believe that Ms. Hoskins had participated in a drug drop." Id. at 21. According to Hoskins this "corruption of the alleged communications" between Peterson, Hutte and Markham rendered their "collective knowledge inapplicable or de minimus." Id. at 14, 17. We disagree.
 
 
 19
 Peterson, though not a law enforcement officer himself, was an inherently trustworthy informant. See United States v. Basey, 816 F.2d 980, 988 (5th Cir.1977) ("citizen reports of criminal activity have been deemed inherently reliable ... in ... Terry -stop cases"). In Adams v. Williams, 407 U.S. 143 (1972), the Supreme Court rejected the theory that "reasonable cause for a stop and frisk can only be based on an officer's personal observation rather than on information supplied by another person." Id. at 147. Instead, the proper issue is whether the information which formed the basis of a police officer's actions possessed sufficient "indicia of reliability." Id.
 
 
 20
 Furthermore, Hutte independently possessed information which, together with information relayed to him, supported an articulable suspicion that the vehicle in question was involved in criminal activity. He learned from Peterson about the plane and the many unusual aspects of its altitude, location and other characteristics of its flight. As a law enforcement officer with over 20 years experience and substantial familiarity with the area where the plane was seen, Hutte "suspected drug trafficking ... because [he] had intelligence through the DEA that [trafficking] has been occurring in that area, ..." R.Vol. II, Tr. at 76. He also learned from Peterson that a truck "that didn't fit the kind of vehicles ... in that area" was headed towards the hill behind which the plane had initially disappeared. Id. at 77, 79. Hutte radioed all this information, as well as his independently formed suspicion about a drug drop, to his office in Carlsbad which, in turn, called the Eddy County Sheriff's Office. Id. at 79-80. Acting on the information received from Hutte, Markham had more than adequate justification for detaining Hoskins' vehicle. Cf. United States v. Randall, 947 F.2d 1314, 1316-19 (7th Cir.1991) (Terry stop justified where officer with probable cause related his suspicion to Police Department, which radioed this information to a patrolman, who in turn directed other officers to detain the suspect).
 
 
 21
 In sum, our review of the record convinces us that the facts found below are not clearly erroneous and that, based on the "totality of the circumstances, including the 'collective knowledge' of all officers in assessing the facts," United States v. Muniz-Ortega, 858 F.2d 258, 260 (5th Cir.1988), there was reasonable suspicion of criminal activity to justify Markham's investigatory stop of Hoskins' vehicle.
 
 
 22
 Finally, Hoskins argues that the Markham's investigatory stop was pretextual because "Ranger Hutte requested the assistance of the Eddy County Sheriff's Department for traffic related violations." At the suppression hearing, Hutte testified that, based on the information he received from Peterson about the speed of Hoskins' vehicle on the unpaved road, he had decided that "she was in violation of [Title 43, Code of Federal Regulations, and that] she was going to receive a violation for creating a public hazard or nuisance." R.Vol. II, Tr. at 80. However, he was not sure whether he had passed this information along to Markham. Thus, according to Hoskins, "Markham would not have seized ... Hoskins' truck absent the false factual basis that the plane had landed and the truck had met the plane." Appellant's Opening Brief at 27.
 
 
 23
 Hoskins' pretext argument is without merit. In United States v. Guzman, 864 F.2d 1512 (10th Cir.1988), we stated that "[a] pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." Id. at 1515. Irrespective of any decision on Hutte's part to issue a traffic violation to Hoskins, his reasonable suspicion of a drug drop had been conveyed to Markham. It was on the basis of that suspicion, not a traffic violation, that Markham detained Hoskins' truck. Because reasonable suspicion existed when Markham initially detained Hoskins' vehicle, the stop was not pretextual.
 
 
 24
 For the reasons stated, we AFFIRM the district court's denial of Hoskins' and Mars' motions to suppress and, therefore, their convictions.
 
 
 
 *
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 Mars appeal (No. 92-2081) was submitted without ognl argument, pursuant to Fed.R.App.P. 34(a); 10th Cir.R. 34.1.9
 
 
 [2]
 The topography in this area, which is approximately 35 miles northwest of Carlsbad, New Mexico, and 45 miles southwest of Artesia, New Mexico, consists of low rolling hills and arroyos. R.Vol. II, Tr. at 43
 
 
 [3]
 Absent probable cause, a vehicle and its occupants may nevertheless be detained for investigation based on the lesser standard of reasonable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1, 21-22, 24 (1968). Under Terry, a police officer may stop an individual briefly if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21