**UNITED STATES of America, Plaintiff,**

**v.**

**Ralph Joseph WALKER, Defendant.**

**No. 90–CR–13.**

United States District Court, D. Utah, C.D.

March 27, 1990.

Heather Cooke, Asst. U.S. Atty., Salt Lake City, Utah, for plaintiff.

James Esparza, Salt Lake City, Utah, for defendant.

## MEMORANDUM OPINION AND ORDER

JENKINS, Chief Judge.

The Constitution of the United States is for everyman. It protects bad men as well as good. It guarantees the rights of individuals "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures...." U.S. Const. amend. IV. The Fourth Amendment is binding on the states. *Wolf v. Colorado*, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949). Its provisions inhibit overreaching by public officers, well motivated or not. Relying upon this guarantee and the rules of law which give it meaning, defendant in this case brought a motion to suppress evidence allegedly obtained in violation of the Fourth and Fourteenth Amendments. The motion was heard and evidence was taken in the matter on March 15–16, 1990. Defendant was represented by James Esparza. The government was represented by Heather Cooke, Assistant United States Attorney.

### FACTS

Defendant Ralph Joseph Walker is a black man who, on January 10, 1990, was traveling west on Interstate 70 in Emery County, Utah. He was driving a blue 1988 Cadillac Fleetwood Brougham. Officer Richard Graham of the Emery County Sheriff's Department was traveling east on the interstate and noticed defendant's vehicle approaching. The traffic was light. Officer Graham observed that the vehicle was traveling at a faster than posted speed. He aimed his radar gun at defendant's vehicle and clocked defendant at 67 miles per hour—12 miles per hour over the posted speed limit. Officer Graham made a U-turn and pulled defendant over.

While coming to a stop behind defendant's vehicle, Officer Graham checked the license plate number on the Cadillac and was informed that the vehicle had not been reported stolen. Officer Graham approached the vehicle and stated that he had clocked defendant speeding. Transcript, Motion to Suppress, March 15–16, 1990 at 48 [hereinafter Transcript]. He asked de-

fendant for his driver's license and vehicle registration and asked where defendant was coming from and his destination. Transcript at 9, 48. Defendant stated that he was coming from Kansas City and was on his way home. Transcript at 11. Defendant then requested permission to get out of the car in order to obtain his license from the back pocket of his slacks. Transcript at 48. As defendant stepped out of the car, he gave Officer Graham the vehicle registration. Defendant was nervous. His hands shook. It was difficult for him to retrieve his license from the small compartment in his wallet. He retrieved the license and gave it to Officer Graham. Transcript at 9.

The license revealed to Officer Graham that it belonged to defendant, identified him, and established his right to operate a motor vehicle. The Cadillac was registered in the name of Marian Smith. Officer Graham questioned defendant about the registration. Defendant stated that Marian Smith was his sister and that he was driving the car with her permission. Transcript at 11. It was later established that defendant had subleased the vehicle from Ms. Smith. A copy of the sublease agreement was in the vehicle glovebox at the time defendant was stopped.

While retaining defendant's license and registration, Officer Graham asked defendant a number of specific questions unrelated to the traffic stop. He asked if there were any weapons in the vehicle, if there were any open containers of alcohol in the vehicle, and if there was any controlled substance or paraphernalia of any kind in the vehicle. Officer Graham then asked if the defendant was carrying any large quantities of cash. Transcript at 12. Defendant answered "no" to each question except for stating that he had about $1600.00 cash in the glove box and about $150.00 cash in his pocket. Transcript at 49. When Officer Graham first approached the vehicle, he saw nothing to indicate that defendant was carrying any of the items about which he put questions. Transcript at 21.

While still holding defendant's license and registration, and without informing defendant that he was free to go, further discussing the speeding violation, or writing a citation, Officer Graham asked defendant if he could search the vehicle for the items about which he had inquired. Defendant responded, "sure, go ahead." Transcript at 12-13. Defendant was then asked to stand by the right front fender of the vehicle. He complied. Officer Graham patted defendant down, checked under his sweater, the top of his slacks, and down his legs. He then searched the passenger compartment of the vehicle. In conformity with defendant's statement, Officer Graham found two rolls of cash in the glovebox which were held together with rubber bands. He found nothing else in the glovebox or in the passenger compartment. Officer Graham then asked for and received the key to the trunk. Transcript at 15. Upon opening the trunk, Officer Graham noticed two tan packages wrapped in clear plastic tape located near the back seat. The packages appeared to be kilogram packages of cocaine. Officer Graham informed defendant that he was under arrest and that he should get on his hands and knees and then lie face down on the ground. Transcript at 15-16.

The defendant and vehicle were taken to Castle Dale, Utah. A search warrant for the vehicle was obtained. Further search of the trunk uncovered 86 kilogram packages of cocaine. Three small plastic bags of cocaine were found in defendant's travel bag.

## DISCUSSION

There is often misunderstanding as to the nature and purpose of a motion to suppress footed on an alleged constitutional violation. The simple purpose is vindication of fundamental law. When a defendant files a motion to suppress, in a sense, it is as if he had filed a class action for and on behalf of all citizens similarly detained. He speaks not just for himself. He speaks for everyman to the end that government achieve constitutional ends by constitutional means. That, simply put, is the glory of a written constitution and the touchstone

of a nation which provides evenhanded law and order for everyman, good or bad.

The narrow but exquisitely important question presented by this case is when may a person stopped for a traffic violation *and nothing more* be further detained and subjected to questions unrelated to the traffic stop.

■ It is well established that "the stopping of a vehicle and the detention of its occupants constitutes a 'seizure' within the meaning of the Fourth Amendment." *Colorado v. Bannister*, 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 43 n. 3, 66 L.Ed.2d 1 (1980); *see also Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979). In order to justify a defendant's *continued* detention, *an officer must have a reasonable suspicion that the stopped vehicle is carrying contraband or that a detained defendant has committed a crime. See United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988) (citing *Florida v. Royer*, 460 U.S. 491, 498–99, 103 S.Ct. 1319, 1324–25, 75 L.Ed.2d 229 (1983)).

Defendant attacks the seizure and search of his vehicle on several grounds. He first contends that the initial stop of his vehicle was pretextual. Defendant's argument focuses on the fact that he is black and was driving a Cadillac on a common drug trafficking route. He contends that these were the reasons he was stopped, not because he was speeding. In the alternative, *defendant contends that even if the stop was justified*, the officer's detention for further questioning was not justified by the traffic stop. Finally, defendant argues that he did not voluntarily consent to having his vehicle searched. The government contends that the initial stop was not pretextual and that the questioning and search that followed were supported by the re-quired reasonable suspicion. The government further contends that, since the vehicle was leased by Marian Smith, defendant has no expectation of privacy and thus no standing to complain.

■ Upon review of the evidence, this court finds that, as a sublessee in possession, defendant had a "legitimate expectation of privacy" in the vehicle, and thus has standing to challenge the search. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). Defendant explained how he had come to possess the vehicle. It was not stolen. There is no evidence that he did not lawfully possess the car. *See United States v. Miller*, 821 F.2d 546, 548–49 (11th Cir.1987); *United States v. Martinez*, 808 F.2d 1050, 1056 (5th Cir.1987), *cert. denied*, 481 U.S. 1032, 107 S.Ct. 1962, 95 L.Ed.2d 533 (1987).

■ The initial stop was not pretextual. "A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." *Guzman*, 864 F.2d at 1515; *see also United States v. Fabela–Garcia*, 753 F.Supp. 326 (D.Utah 1988) (granting motion to suppress). In determining whether an officer had legal justification to stop a vehicle, an objective standard is used. *Guzman*, 864 F.2d at 1517. The court should ask itself whether, under the same circumstances and with the absence of any invalid purpose, a reasonable officer would have made the stop. *Id.*

A reasonable officer would have stopped defendant under these circumstances. Defendant was traveling twelve miles per hour over the posted speed limit. Police officers routinely stop cars that are traveling at such speeds and issue warnings or citations. This stop was objectively justified, and there is no evidence to suggest that the stop was pretextual.

■ Having determined that the initial stop was constitutional, the court must next consider the detention and search that followed and determine "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–1879, 20 L.Ed.2d 889 (1968); *see also Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.").

The Tenth Circuit's *Guzman* opinion is instructive, indeed controlling, regarding a continued detention and search when a person is stopped for a traffic violation. The facts in this case and the facts of *Guzman* are very similar. *Guzman* points out that "[a]n officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *Guzman* 864 F.2d at 1519 (citing *United States v. Gonzalez,* 763 F.2d 1127, 1130 (10th Cir.1985); *United States v. Recalde,* 761 F.2d 1448, 1455 (10th Cir.1985)). The *Guzman* court stated:

> When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, **without being subjected to further delay by police for additional questioning.** In order to justify 'a temporary detention for questioning,' the officer must also have reasonable suspicion 'of illegal transactions in drugs or of any other serious crime'.

*Id.* (emphasis added) (citations omitted).[1]

The narrow issue here is whether, *prior* to asking questions unrelated to the traffic stop, the officer had a "reasonable suspicion of illegal transactions in drugs or of any other serious crime" which justified further detention of defendant. *Id.* Upon reaching the driver's door, the officer asked for and received defendant's driver's license and the car registration. The li-

cense was valid and belonged to defendant. The vehicle registration identified Marian Smith as the registered owner. The officer questioned defendant, who responded that Ms. Smith was his sister and that he was driving the car with her permission. The automobile was not stolen. Defendant appeared nervous. His hands shook when he removed the license from his wallet. At that point the officer asked defendant if he had any weapons, alcohol, or any type of controlled substance or paraphernalia of any kind in the vehicle. The officer further asked if defendant had any large quantities of cash in the vehicle.[2] Defendant answered "no" to each of these questions, except for stating that he had $1600.00 in the glovebox and $150.00 in his pocket. Finally, the officer asked if he could search the vehicle for the items about which he had asked.

At the suppression hearing, the government relied on defendant's nervousness and the registration in a name other than his own as the basis for continued detention and questioning. Defendant relied on *Guzman* to establish that continued detention was not "objectively reasonable." In *Guzman,* when an officer approached one of the defendants, she would not look the officer in the eye, was apprehensive, and was notably perspiring. *Guzman* 864 F.2d at 1520. The court also noted that she was noticeably pregnant and was sitting in a car with the engine off in the middle of the

1. In *Guzman,* the officer asked defendant "whether his wife was employed, where he was headed, where he worked, when he got married, and if they were carrying any large sums of money." *Guzman* at 1514. The officer further inquired as to whether "they were carrying weapons or contraband." *Id.* The Tenth Circuit recognized the fact that the district court deemed these intrusive questions that the ordinary citizen would find offensive. *Id.* at 1519.

2. The United States Supreme Court has "yet to rule directly on whether mere questioning of an individual by a police official, without more, can amount to a seizure under the Fourth Amendment...." *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). The Court stated that:

> [P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so

without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.

*Id.* In this case, the officer did more than just question defendant. The officer had pulled defendant over to the side of the road and had possession of his driver's license and vehicle registration. Because the officer had his papers, defendant was not free to leave. Defendant testified that he felt he was going to be arrested at any moment. Transcript at 55. As in *Guzman,* the stop was a seizure which evoked Fourth Amendment protection requiring reasonable suspicion to justify defendant's continued detention and questioning.

desert several thousand miles from her home. *Id.* Under those circumstances, the court found that her actions did not arouse objective suspicion.[3] *Id.* As in *Guzman*, defendant's nervousness in this case did not create objective suspicion justifying the officer's continued detention and intrusive questions.

*Guzman* stated that "when the driver produces ... *proof* that he is entitled to operate the car, he must be allowed to proceed on his way...." *Id.* at 1519 (emphasis added). Defendant furnished the registration and stated that he had permission to operate the car. The officer asked for nothing more. Defendant later testified that the glovebox contained a signed copy of a sublease agreement between Ms. Smith and defendant. Had the officer asked for proof of entitlement to operate the Cadillac, defendant claims that he would have produced it. This, coupled with the facts that the officer had no evidence to establish that the car was stolen or that defendant was not entitled to operate it, leaves the record bereft of evidence, at that point, to establish reasonable suspicion that defendant had committed a crime or was carrying contraband. The question of sequence is of monumental importance.

The government's final argument is that defendant was detained for only ten minutes before he was arrested. The United States Supreme Court made clear in *United ed States v. Sharpe*, 470 U.S. 675, 685–87, 105 S.Ct. 1568, 1574–76, 84 L.Ed.2d 605 (1985), that the basis for and circumstances surrounding the stop, rather than an arbitrary time limit, determine the stop's permissible length. Here, the stop was for a short period of time. Nevertheless, the detention was unreasonable because it extended beyond the scope justified by the original traffic stop. The officer continued the detention without additional facts to establish reasonable suspicion of a more serious crime. The detention and subsequent search thus violated the Fourth Amendment. *See Guzman*, 864 F.2d at 1519 n. 8.

Defendant's final argument is that he did not voluntarily consent to the search. Having found that defendant's Fourth Amendment rights were violated at the time the officer detained him and put additional questions, the court need not address the issue of consent.

## CONCLUSION

State officers must comply with fundamental rules. They must act constitutionally. When they do not, evidence gathered in derogation of fundamental rules cannot be used. This is done not to insulate a defendant from prosecution but to vindicate—take seriously—the applicable constitutional provision. No one has yet come up with a better way to ensure compliance with the Constitution by state officers as they attempt to carry out their duties.

At times the lines drawn by Court of Appeals are very narrow lines. Nevertheless, the lines as drawn by the Court of Appeals are binding on officers who gather evidence, prosecutors who screen and prosecute offenses, and trial courts who hear cases. In applying the lines that were drawn in *Guzman*, this court notes that "[t]here is nothing new in the realization that· the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks*, 480 U.S. 321, 329, 107 S.Ct. 1149, 1154–1155, 94 L.Ed.2d 347 (1987). Officer Graham had legal justification to stop defendant for a traffic violation. After inspecting defendant's driver's license and vehicle registration, the officer did not have facts sufficient for an objective, reasonable suspicion to justify continued detention and more extensive questioning. From that point on evidence obtained was tainted and must be suppressed. *Guzman*, 864 F.2d 1512.

IT IS SO ORDERED.

---

**3.** In *United States v. Grillo*, 705 F.Supp. 576 (M.D.Ga.1989), the court found that nervousness, combined with the facts that the officer *knew* that the defendant had a loaded gun and that while stopped defendant had reached under his seat and either retrieved or placed something, established reasonable suspicion which justified additional questioning.