**UNITED STATES of America, Plaintiff,**

v.

**Maria A. CASTILLO, and Robert C. Sainz, Defendants.**

**No. 93–CR–261J.**

United States District Court,
D. Utah,
Central Division.

Jan. 26, 1994.

David J. Schwendiman, Kevin Sundwall, U.S. Attys. Office, State of Utah, Salt Lake City, UT, for plaintiff.

Deirdre A. Gorman, Farr, Kaufman, Sullivan, Ogden, UT, for Maria A. Casillo.

Reid Tateoka, McKay, Burton & Thurman, Salt Lake City, UT, for Robert C. Sainz.

## ORDER

JENKINS, District Judge.

On October 6, 1993, defendants, Maria A. Castillo ("Castillo") and Robert C. Sainz ("Sainz") were indicted for unlawful possession of a controlled substance (marijuana) with intent to distribute in violation of Title 21 U.S.C. § 812 and aiding abetting therein in violation of Title 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. In addition, defendants were indicted for knowingly using and carrying a firearm (a Colt .45 caliber handgun) during and in relation to a "drug trafficking crime ... for which [they] may be prosecuted in a court of the United States" in violation of 18 U.S.C. §§ 924(c)(1) and (2). These charges were partly based upon evidence obtained by Utah Highway Patrol Trooper Lynn McAfee ("Trooper McAfee") when he searched Sainz's bags located in the bed of defendants' truck on or about September 24, 1993,[1] without benefit of a search warrant.

■ The Constitution of the United States works for the benefit of all people found within the individual states or territories. The Fourth Amendment of the Constitution guarantees the rights of all individuals "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures...." U.S. Const.Amend. IV.[2] Its provisions seek to inhibit overreaching by public officers, well motivated or not.

---

**1.** The Indictment indicates that the incident at issue in this case occurred on or about September 25, 1993. The testimony, arguments, police report and papers filed by the parties, however, indicate that the incident actually occurred on or about September 24, 1993.

**2.** The Fourth Amendment is made binding on the states through the Due Process Clause of the Fourteenth Amendment. *Wolf v. Colorado,* 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361–1362, 93 L.Ed. 1782 (1949).

Relying on the Fourth Amendment's guarantee and the legal rules that give it meaning, defendants in this case moved to suppress evidence obtained in violation of the Fourth and Fourteenth Amendments.[3] Defendants argue that evidence seized during a traffic stop and subsequent drug investigation on September 24, 1993, was obtained by Trooper McAfee in violation of defendants' Fourth Amendment rights, specifically: that the stop of their vehicle was pretextual and accomplished in violation of their right against unreasonable searches and seizures; that the total circumstances did not provide Trooper McAfee with reasonable suspicion to justify continued detention of defendants beyond that time necessary to process the traffic stop, and; and that defendant Castillo's "consent" to search the vehicle was not voluntary and was therefore invalid. In their response to defendant's motion to suppress, the United States argues that the stop was not pretextual, but made in the usual course of enforcement of traffic laws, that Trooper McAfee's request for consent was supported by objectively reasonable suspicion and that defendant Castillo's consent was voluntary.

The court held an evidentiary hearing on defendants' motion on December 23, 1993. Defendant Castillo was present and represented by Deirdre A. Gorman. Defendant Sainz was present and represented by Reid Tateoka. The government was represented by Assistant United States Attorney Kevin Sundwall. After hearing counsels' arguments, receiving evidence and hearing the testimony of Trooper McAfee, Utah Highway Sergeant Paul Mangelson ("Sergeant Mangelson"), and both defendants, the court requested that the government file a supplemental memorandum addressing authoritative case law, particularly *United States v. Walker*, 933 F.2d 812 (10th Cir.1991), and *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988), in the context of the circumstances surrounding the stop at issue in this case. The government filed its supplemental memorandum on December 30, 1993 (dkt. 38). Defendant Sainz filed his reply memorandum January 5, 1992 (dkt. 39) and defendant Castillo filed her reply January 6, 1993 (dkt. 40). On January 7, 1993, the court held a continued hearing on defendants' motion to suppress. Defendants were present and represented by their respective counsel as indicated above. The government was again represented by Kevin Sundwall.

## FACTS

On or about September 24, 1993, at approximately 12:50 p.m., defendant Castillo, a hispanic woman, defendant Sainz, a hispanic man, and the couple's three-year old son, were travelling northbound on Interstate 15 in Juab County, Utah. Defendants were travelling in a new, custom-built, white Chevrolet pick-up truck. Trooper McAfee testified that he was in his patrol car travelling southbound (either sitting in the median or moving) on Interstate 15 near milepost 217 when he noticed defendants' truck approaching from the south. Transcript of Motion to Suppress Proceedings, December 23, 1993, at 7 ("Tr."). At that time, the trooper observed that defendants' truck had a darkly tinted driver's side window which he believed to be in violation of Utah Administrative Code R714-158-10.[4] Tr. at 39. Trooper McAfee made a U-turn, crossed the median and pulled defendants over. Tr. at 39-40. The trooper testified that as he pulled behind the defendants' vehicle, he noticed that it had Texas license plates. Tr. at 40. Pursuant to instructions contained in a police bulletin issued by the central Utah Highway Patrol office, Trooper McAfee knew that he was authorized only to stop the car and give the driver a warning ticket.[5] Tr. at 61, 73.

---

**3.** The parties agree that both defendants have standing to move to suppress the evidence obtained.

**4.** Utah Administrative Code R 714–158–10(B)(1) provides:

[n]o person shall operate any vehicle on any public highway, road, or street with the front windshield, the side windows to the immediate right and left of the driver that do not meet the requirements of FMVSS [Federal Motor Vehicle Safety Standards] 205 in effect at the time of manufacture.

**5.** Pursuant to "highway policy," Trooper McAfee was authorized to advise the driver of the violation, explain the law to her, and issue a written warning. Tr. at 61.

After stopping defendants' vehicle, Trooper McAfee exited his car and approached the vehicle and observed that the truck was customized. Tr. at 17–18. From this, the trooper deduced from this that it might contain a hidden compartment. *Id.* In particular, Trooper McAfee noted that there were caps on the tie down holes and fresh undercoating under the wheel wells. *Id.* Trooper McAfee testified that once he reached the driver's side of the truck he told the driver, defendant Castillo, his reason for pulling her over and asked for her license and registration. Tr. at 18–20. Trooper McAfee testified that as Castillo rolled down her window he noticed a strong odor of air freshener emanating from the cab of the truck.[6] Tr. at 19, 63–64. Castillo produced a valid Washington State driver's license and a Texas registration. Tr. at 20–21. Allegedly, the registration was difficult to read so Trooper McAfee asked Castillo who owned the vehicle. Tr. at 21. Castillo told him that she and her uncle jointly owned the vehicle. Tr. at 21. Trooper McAfee testified that at that point he was satisfied that Castillo was in lawful possession of the vehicle. Tr. at 48 and 65–66.

Instead of issuing a warning citation at this point, Trooper McAfee chose to retain Castillo's license and registration and institute an inquiry into matters unrelated to the traffic stop. Specifically, he asked Castillo why she did not have a Texas driver's license. Tr. at 22–23. Castillo responded that "she'd been in Texas for a month—or they had been in Texas for a month looking for jobs, and they planned to move there and they were unable to find employment" (Tr. at 22.) and therefore "they" were returning to Washington. Tr. at 22–23. Trooper McAfee testified that as he continued his questioning, he observed that Castillo appeared more nervous, would not maintain eye-contact and briefly hesitated before answering his questions. Tr. at 23–24. Trooper McAfee asked defendants if they were employed in Washington state. Tr. at 23 and 25. Defendant Sainz told the trooper that he worked as a landscaper in Washington state. Tr. at 25. The trooper testified that he though it was odd that Sainz would leave his landscaping position for part of the months of August and September, so he asked Sainz if someone was working for him in his absence. Tr. at 25. Sainz replied that he flew down a week earlier to drive back to Washington with defendant Castillo.[7] *Id.* Trooper McAfee testified that based on his observations up to this point, he was suspicious that defendants were transporting narcotics and asked defendant Castillo if there were any drugs in the vehicle. Tr. at 25. Castillo replied "no." *Id.* While still holding Castillo's license and registration, without further discussing the window tinting violation, writing a warning citation, or informing Castillo that she was free to go, Trooper McAfee asked Castillo if he could go ahead and look in the vehicle for drugs and she allegedly replied, "go ahead." Tr. at 26, 104.

At this point, Trooper McAfee returned to his vehicle, still retaining Castillo's license and registration, ran a records check on Castillo,[8] issued a warning citation for the window tint violation,[9] and filled out a consent to search form for Castillo to sign. Tr. at 2, 71–72. In addition Trooper McAfee called Utah Highway Patrol Sergeant Paul Mangelson, stating that he thought he had found a hidden compartment in a vehicle he had stopped and wished assistance. Tr. at 26–27. Trooper McAfee then returned to the driver's side of defendants' vehicle, returned Castillo's driver's license and registration, gave her the warning citation and asked her to

---

**6.** A paper air freshener was found hanging from a knob on the passenger side of the vehicle's dashboard. Tr. at 64.

**7.** Trooper McAfee testified that Sainz's answer made him suspicious because it conflicted with Castillo's statement that "they" had been in Texas for about one month. Tr. at 25.

**8.** The computer check indicated that Castillo had no outstanding warrants. As mentioned before, McAfee did not run a records check on the vehicle to verify the registration. Tr. at 26–27, and 75.

**9.** Trooper McAfee testified that at the time he had, in his glove compartment, a test plate of tinted glass showing the maximum allowable tint. Tr. at 9. The trooper did not, however, test the windows of defendants' truck.

read and sign the consent to search form, which she allegedly did. Tr. at 27–28.

Sergeant Mangelson arrived on the scene at approximately this point and officers began circling the truck, searching for hidden compartments. Tr. at 29–30. The trooper testified that during their examination of the truck bed he detected a strong odor of raw marijuana. Tr. at 30. At about the same time, Sergeant Mangelson made a fist and hit a black duffle bag that was among several located in the truck bed. Tr. at 30. Sergeant Mangelson then unzipped the bag and discovered six (6) "bales" of marijuana. Tr. at 30–31. Defendants were then placed under arrest and transported to the Juab County Sheriff's Office. Tr. at 31. The officers subsequently searched the other bags located in the truck bed and discovered a total of one-hundred-and-three (103) pounds of marijuana. *See* Tr. at 31; Complaint at 6. A subsequent search of the truck's interior revealed a loaded .45 caliber handgun, a records check showed that the handgun had been reported stolen. Tr. at 34–35. Ultimately, no hidden compartment was found.

## DISCUSSION

The narrow and extremely important question presented by this case is this: when may a police officer detain a person stopped for a traffic violation *and nothing more* beyond that time necessary to effectively deal with routine traffic enforcement, and subject that person to questioning unrelated to the traffic stop? Every person protected by or looking for guidance to the words and spirit of the United States Constitution is entitled to a carefully considered answer to this question.

In this case, defendants attack the seizure of their vehicle on several grounds. They first contend that the initial stop of their vehicle was pretextual. Defendants' argument focuses on the fact that they are hispanic and were driving a new customized Chevrolet pickup truck with Texas plates. Defendants claim that these were the reasons they were stopped, not because their windows were tinted. Alternatively, defendants argue that even assuming the stop was justified, their detention for further questioning was not justified by the traffic stop.

Further, defendants argue that defendant Castillo did not voluntarily consent to the search of the truck. And finally, assuming defendant Castillo's consent was valid and voluntarily given, such consent to search the truck did not extend to defendant Sainz's bags located in the open bed of the truck. The government contends that the initial stop was not pretextual, that the questioning, detention and search that followed were supported by the required reasonable suspicion and that defendant Castillo's consent was valid and extended to the bags located in the truck bed.

### Pretext Stop

Upon review of the evidence, this court finds that the initial stop was pretextual. "A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop." *Guzman,* 864 F.2d at 1515. "The classic example, presented in this case, occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity." *Id.* The question when determining whether an officer had legal justification to stop a vehicle is "not whether the officer *could* validly make the stop, but whether under the same circumstances a reasonable officer *would* have made the stop in absence of the invalid purpose." *Id.* at 1517 (quoting *United States v. Smith,* 799 F.2d 704, 709 (11th Cir.1986)).

This court finds that a reasonable officer would not have stopped the defendants under the circumstances presented to the court, absent another purpose. Defendants were travelling northbound on Interstate 15. Trooper McAfee was stationed to the west on southbound Interstate 15. The Trooper's car was facing south, either parked in the median or moving in southbound traffic. In order for Trooper McAfee to pull the defendants' over, he had to turn his vehicle around, cross the median, speed up and pull the vehicle over, all with the knowledge that he could only issue a warning citation to the driver of

the vehicle, assuming the window tinting violated the law. A reasonable police officer would not ordinarily issue a warning citation to the driver of an out-of-state vehicle for an alleged violation of the Utah window tint law, absent some other reason to stop the car. *See* Tr. at 72–74.

The facts of this case indicate that Trooper McAfee stopped defendants vehicle for an improper purpose and that "the stop would not have been made but for a suspicion that could not constitutionally justify the stop." *Guzman,* 864 F.2d at 1518. Although he allegedly stopped defendants' truck for having a tinted driver's side window which did not conform to Utah law, Trooper McAfee did not discuss the window tint violation with defendants except to initially advise them as to why he'd pulled the vehicle over. He did not at any time compare the windows with the window tint test plate in his possession; nor did he commence writing out a warning citation. Tr. at 67–68. Instead, he began a line of questioning unrelated to the traffic stop. This stop was not objectively justified, but was pretextual and as such, unconstitutional.

### Unlawful Detention

 It is well established that "the stopping of a vehicle and the detention of its occupants constitutes a 'seizure' within the meaning of the Fourth Amendment." *Colorado v. Bannister,* 449 U.S. 1, 4 n. 3, 101 S.Ct. 42, 43 n. 3, 66 L.Ed.2d 1 (1980). In order to justify a defendant's continued detention, an officer must have a reasonable suspicion that the stopped vehicle is carrying contraband or that a detained defendant has committed a crime. *Guzman,* 864 F.2d at 1519.

Even assuming the initial stop in this case was not pretextual, the subsequent detention that followed was not "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Careful scrutiny of the sequence of events as they occurred on September 24, 1993, is crucial to proper analysis of this case.

The Tenth Circuit's opinions in *Guzman* and *United States v. Walker,* 933 F.2d 812 (10th Cir.1991), are instructive, indeed controlling in this case regarding a continued detention and search when a person is stopped for a traffic violation. The facts in this case are quite similar to those of *Guzman* [10] and *Walker.* [11] In both *Walker* and *Guzman* the court of appeals points to and utilizes the dual inquiry adopted by the Unit-

**10.** In *Guzman,* a New Mexico State Police Officer stopped a hispanic couple travelling west through New Mexico on Interstate 40 in a rented Cadillac with Florida license plates on the pretext that they were in violation of state traffic regulations because the driver was not wearing his seat belt. After ascertaining that the driver held a valid driver's license and was in lawful possession of the vehicle the officer decided to conduct a further investigation to determine whether defendants were transporting contraband in the vehicle. The officer asked a number of questions unrelated to the traffic stop, noted the passenger's nervousness, and asked the driver if he could search the vehicle. The driver told the officer that he was free to look. The officer then produced a written consent form and the driver signed the form. In the search that ensued, the officer found a package of cocaine behind the rear seat and arrested the defendants. 864 F.2d at 1513–1514.

**11.** In *Walker,* the police officer pulled the defendant over for going 67 miles per hour in a 55 mile per hour speed zone. Before getting out of his car, the officer ran a computer check on defendant's vehicle and determined that it had not been reported stolen. The officer then ap-

proached the defendant's vehicle, asked for and received defendant's driver's license and registration, and noted the defendant's nervousness. Although the vehicle was registered to someone other than the defendant, the officer was informed that the registered owner was defendant's sister and the officer did not pursue the matter further. Instead, the officer retained the license and registration and asked the defendant a number of questions unrelated to the traffic stop such as if the defendant was carrying any large quantities of cash, if there were any weapons, drugs, or paraphernalia of any kind in the vehicle. The defendant answered "no" to all of the officer's questions. Then, while still retaining the defendant's license and registration, and without discussing the traffic violation any further, issuing a citation, or informing the defendant that he was free to go, the officer asked defendant if he could search the vehicle for the items discussed above. The defendant replied "sure, go ahead." The subsequent search revealed large quantities of cash, and several kilograms of cocaine. The officer then arrested the defendant. 933 F.2d at 813–814.

ed States Supreme Court for evaluating the reasonableness of investigative detentions. 933 F.2d at 815; 864 F.2d at 1518: "Under this approach, the court determines 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Walker*, 933 F.2d at 815 (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). Thus, in this case, the court must determine whether the detention reasonably extended beyond the length necessary for its purportedly legitimate purpose—the issuance of a written warning for a window tinting violation.

The stopping of a vehicle for a traffic violation is ordinarily a limited seizure. *Guzman*, 864 F.2d 1512, 1519 (citing *United States v. Gonzalez*, 763 F.2d 1127, 1130 n. 1 (10th Cir.1985)). "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check and issue a citation." 864 F.2d at 1519; 933 F.2d at 815. "Once a driver has produced a valid license and proof that he is entitled to operate the car, **'he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.'"** *Walker*, 933 F.2d at 816 (citing *Guzman*, 864 F.2d at 1519) (emphasis added)). "In order to justify 'a temporary detention for questioning,' the officer must also have reasonable suspicion 'of illegal transactions in drugs or of any other serious crime.'" 864 F.2d at 1519 (citations omitted).

The narrow issue here, is whether *prior* to asking questions unrelated to the traffic stop, the trooper had a "reasonable suspicion of illegal transactions in drugs or of any other serious crime" which justified further detention of defendants. *Id.* Trooper McAfee testified that upon pulling defendants over he observed that the pickup truck was licensed in Texas and the customized nature of the truck, particularly he noted the covered tiedown holes and fresh undercoating. Tr. at 17–18, 40. When the trooper reached the driver's side of the pickup truck, Castillo rolled down her window and the trooper noted a strong smell of air freshener emanating from the cab. Tr. at 19, 63–64. At that time the trooper asked for and received Castillo's valid driver's license and truck registration. Tr. at 20–21. The registration was allegedly at least partially illegible, but the trooper at least ascertained that Castillo was in lawful possession of the vehicle. Tr. at 21, 48, 65–66. Castillo appeared nervous. Tr. at 23–24.

After ascertaining that Castillo had a valid driver's license and was in lawful possession of the vehicle, the trooper's authority was limited by the "highway policy" bulletin, state law and the Fourth Amendment to issuing a warning. *See Guzman*, 864 F.2d at 1519; *Walker*, 933 F.2d at 816. Without issuing a written warning or returning Castillo's license and registration, however, Trooper McAfee began a line of intrusive questioning wholly unrelated to the traffic stop. Because Trooper McAfee had Castillo's papers, defendants were not free to leave, but compelled to remain and endure the trooper's continued questioning.[12]

At the suppression hearing, the government relied on the following to support its assertion that the trooper's continued detention and questioning of defendants was lawful: that the truck was customized with certain features which would cause a reasonable officer to be suspicious that a false bed was being concealed; that the officer detected the smell of air freshener when Castillo opened the truck's window; that the truck was registered in Texas and the defendants claimed to be from Washington state; that defendants were travelling from Texas, a known drug import state, and that the defendants appeared nervous and gave confused, conflicting answers to the officer's questions.

The government fails to recognize the importance of *the sequence* of events to proper analysis of this case. At the precise point

---

12. The Fourth Amendment's ban on unreasonable seizures does not prohibit an officer from asking a motorist questions if the encounter is consensual. 933 F.2d at 817. The record in this case clearly shows that the encounter between the defendants and Trooper McAfee was not consensual. The trooper retained Castillo's license and registration the entire time he questioned the defendants and only returned the items upon obtaining Castillo's consent to search the truck.

in time that Trooper McAfee *began* asking the defendants questions unrelated to the traffic stop he had observed only the following: defendants were travelling in a new customized pickup truck registered in Texas; the smell of air freshener emanated from the truck's cab, and;[13] that Castillo had a valid Washington driver's license and she appeared nervous.[14] Castillo had furnished the registration and stated that she was partial owner of the truck. Trooper McAfee asked for nothing more. Based on those observations alone, the trooper detained the defendant and began asking intrusive questions unrelated to the traffic stop. *Guzman* and *Walker* require that "when the driver produces ... *proof* that he is entitled to operate the car, he must be allowed to proceed on his way...." 864 F.2d at 1519; 933 F.2d at 816. The record is bereft of evidence which *at that point*, would establish a basis for reasonable suspicion that defendants had committed a crime or were carrying contraband. Again, the court stresses, that the question of sequence is of monumental importance. This court finds that under all of the circumstances, the facts, as observed by Trooper McAfee did not give rise to an objective reasonable suspicion of criminal activity justifying the trooper's continued detention and intrusive questioning of the defendants.

### Invalid Consent

In *Walker*, the court of appeals affirmed the footing of this court's finding of an un-

constitutional detention and recognized the existence of the Fourth Amendment violation upon which this court's suppression order was based. 933 F.2d at 817. The court of appeals, however, vacated the suppression order and remanded the matter for a further determination of the validity and effect of Walker's alleged consent to the search of his automobile pursuant to the multiple factors set forth in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). In light of *Walker*, it appears that the court must now also address the question of the validity of Castillo's alleged consent to the search of the truck, that is, whether the unconstitutional and illegal detention of the defendants without probable cause, and in violation of both *Guzman* and *Walker*, was cured by Castillo's alleged consent to the search of the defendants' truck given while the defendants were unlawfully detained.

"Where a search is preceded by a Fourth Amendment violation, the consent is valid only if it is voluntary in fact." *Guzman*, 864 F.2d at 1520. A court's determination of "voluntariness" hinges on examination of the totality of the circumstances surrounding the consent. *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973)). In *Brown*,[15] the United States Supreme Court outlined the factors to be considered in de-

---

13. In *United States v. Gonzalez*, 763 F.2d 1127 (10th Cir.1985), the court of appeals found that where the officer smelled a deodorizer, which he testified is often used to mask the odor of narcotics, and failed to articulate other facts giving him a more specific cause for suspicion to justify a search, he lacked probable cause to arrest defendant or to conduct a warrantless search of his vehicle. *Id.* at 1129–30.

14. *Guzman* instructs us that mere "nervousness" projected by a driver or passenger during a traffic stop is insufficient to create objective suspicion justifying the officer's continued detention and intrusive questions. *See* 864 F.2d at 1520; *United States v. Walker*, 751 F.Supp. 199, 203–04 (D.Utah 1990).

15. In *Brown*, the defendant was arrested without probable cause and without a warrant under circumstances indicating that the arrest was made for investigatory purposes. After officers gave the defendant *Miranda* warnings and placed him in custody, defendant made inculpatory

statements and was later indicted for murder. Subsequently, the defendant moved to suppress his statements. The trial court denied defendant's motion and the statements were used in the trial and the defendant was convicted. The defendant appealed his conviction and the United States Supreme Court eventually considered the case. The question before the Court was whether the statements made by the defendant after he was given his *Miranda* warnings were made voluntarily.

This case involves the voluntariness of Castillo's alleged consent to the search of her truck while she was being unlawfully detained without probable cause and before she was given *Miranda* warnings. In *United States v. Mendoza–Salgado*, the Tenth Circuit Court of Appeals determined that the standard set forth in *Brown* is applicable to cases involving a defendant's alleged consent to a search. 964 F.2d 993, 1010–1011 (10th Cir.1992).

termining whether a defendant's act in making statements after an unlawful arrest was "sufficiently an act of free will to purge the primary taint of the unlawful invasion," whether the evidence to which the objection is made was obtained by " 'exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Brown,* 422 U.S. at 597, 599, 95 S.Ct. at 2258, 2259 (quoting *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quoting MacGuire, *Evidence of Guilt* at 221 (1959))). As applied to this case, the three *Brown* factors are (1) the temporal proximity of the illegal detention and the consent, (2) the presence or absence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Walker,* 933 F.2d at 818; *Guzman,* 864 F.2d at 1520 (citing *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62)).

▪ In this case, the illegal detention and the alleged consent were intimately connected in time and circumstance. Defendants were pulled over, the trooper obtained and retained Castillo's license and registration and launched into a line of questioning unrelated to the traffic stop, and concluded that line of questioning with a request for consent to search the vehicle. Castillo did not volunteer information or initiate the conversation during which the alleged consent occurred. At the time he requested consent to search the vehicle, Trooper McAfee retained the license and registration and had not returned them to Castillo, nor did he indicate in any way that he would do so in the immediate future. Castillo was not "free to go" at the time the officer requested and obtained her alleged consent. The court finds that there was no meaningful intervening time between Castillo's illegal detention and her alleged grant of consent to search her truck. *See United States v. Recalde,* 761 F.2d 1448, 1457–58 (10th Cir.1985). Moreover, there was no realistic opportunity for intervening circumstances to occur. The request for permission to search came from Trooper McAfee while he retained Castillo's driver's license and registration. The inquiry should not have been made at the time it was made. There was no "demonstrably effective break

in the chain of events leading from the illegal arrest to the [consent]. . . ." *Brown,* 422 U.S. at 611, 95 S.Ct. at 2265 (Powell, J., concurring in part). They are all of a piece.

Next, the court must look to the "purpose and flagrancy" of the trooper's unlawful conduct. Although the government fails to articulate clearly Trooper McAfee's purpose in unlawfully detaining the defendants, it is apparent to the court that he simply sought to confirm his intuition suspicion that defendants were engaged in transporting drugs. No matter how accurate their intuitive suspicions may be, peace officers *must* conform their official conduct to the standard articulated in *Guzman:*

> An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he [or she] is entitled to operate the car, he [or she] must be allowed to proceed on his [or her] way, *without being subject to further delay by police for additional questioning.*

864 F.2d at 1519 (emphasis added). After the requirements of *Guzman* were met, Trooper McAfee had a duty to let Castillo proceed without further delay for questioning. The trooper deliberately failed to do so. Instead, he unlawfully detained Castillo without reasonable suspicion to inquire into matters unrelated to the traffic stop for purposes of seeking information to which he was not at that point entitled. The trooper's request for consent to search was directed to a person who was not free to go. Such conduct is "flagrant" within the meaning of *Brown;* its purpose directly exploits the unlawful detention and as such, directly violates the law as set forth in *Guzman.*

▪ In addition, Castillo's "consent" was not "informed." Castillo was unlawfully detained. She was not free to leave. Nowhere does Trooper McAfee even suggest that he advised Castillo that she was free to leave before he asked for her consent to search. She could not effectively consent to a search free from the taint of the violation of her Fourth Amendment rights unless she was aware that she was free to leave, and that

her rights had been and were being violated. Trooper McAfee did not inform Castillo that her Fourth Amendment rights had been and were being violated. She was not informed that the search could not legally be performed absent her informed consent. Absent this information, Castillo's "consent" was no consent at all. Her giving of uninformed "consent" is too weak to remove or cure the taint of the unconstitutional detention. It was in fact, the intended product of such detention.

## CONCLUSION

State officers must act within the confines of the United States Constitution. If they fail to do this, evidence gathered in contravention of constitutional rights cannot be used. Trooper McAfee's stop of defendants was pretextual. However, even assuming that the initial stop did not violate the Fourth Amendment, after receiving and inspecting Castillo's driver's license and registration, the circumstances did not present facts sufficient for an objectively reasonable suspicion justifying Trooper McAfee's continued detention and extensive questioning unrelated to the traffic stop. From that point on, the evidence obtained was tainted and must therefore be suppressed. *Guzman,* 864 F.2d at 1512. Furthermore, Castillo's alleged consent to search the truck did not "purge the taint" of Trooper McAfee's unlawful and flagrant conduct in unconstitutionally detaining Castillo for the purpose of seeking to obtain incriminating evidence to which he was not constitutionally entitled. Again, the Fourth Amendment's guarantees, among the basic underpinnings of this society, are in place for the benefit of all, the lawful and the lawless alike. In performing their official duties, peace officers themselves, no less than the offenders they would bring to justice, must act within the law.

**IT IS SO ORDERED.**