**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Maria A. CASTILLO and Robert C.
Sainz, Defendants–Appellees.**

**No. 94–4053.**

United States Court of Appeals,
Tenth Circuit.

Feb. 6, 1996.

Rehearing Denied April 17, 1996.

David J. Schwendiman, Assistant United States Attorney (Scott M. Matheson, Jr., U.S. Attorney, with him on the brief), Salt Lake City, Utah, for Plaintiff–Appellant.

Deirdre A. Gorman of Ogden, Utah, for Maria A. Castillo, Defendant–Appellee.

Reid Tateoka, Salt Lake City, Utah, for Robert C. Sainz, Defendant–Appellee.

Before KELLY, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and VRATIL, District Judge.*

McWILLIAMS, Senior Circuit Judge.

A white, late model Chevrolet pickup truck driven by Maria Castillo and in which her husband, Robert Sainz, and their 3 year old son were passengers, was stopped on an Interstate Highway in Utah by Richard McAffee, an officer in the Utah Highway Patrol, because it had tinted windows which Officer McAffee thought were in violation of a state equipment requirement that tinted windows must transmit 70% of the existing light. About ten minutes after the stop, a search of the truck disclosed 105 pounds of marijuana and a loaded .45 caliber handgun in the console of the vehicle between the driver's seat and the passenger's seat. More will be said later about the sequence of events occurring in the ten-minute period between the initial stop and the discovery of the marijuana and the handgun.

By indictment Castillo and Sainz were jointly charged with possessing with an intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), and in a second count with using and carrying a firearm during and related to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1) and 2.

Thereafter, Castillo filed a motion to suppress the government's use at trial of the marijuana and firearm "illegally obtained" from her vehicle, alleging that the officer's stop of her vehicle, and the ensuing search of her vehicle, were in violation of the Fourth and Fourteenth Amendments. Sainz joined in Castillo's motion to suppress. Memoranda were filed both in support of, and in opposition to, the motion to suppress.

A hearing was held on the motion to suppress at which time Officer McAffee testified, as well as Officer Paul Mangelson, a "backup" officer who was called in after the stop. Castillo and Sainz also testified. The district court by order then granted the motions to suppress. *United States v. Castillo,* 864 F.Supp. 1090 (D.Utah 1994). Pursuant to 18 U.S.C. § 3731, the government appeals the order of the district court suppressing the use at trial of the marijuana and handgun taken from the pickup. We reverse.

Officer McAffee testified that the only reason he stopped the pickup in question was because he believed the tinted windows were in violation of what was then a state equipment requirement. The requirement, now codified in statute, required tinted windows to transmit at least 70% of the existing light, and exclude no more than 30% of the light. Officer McAffee said that at the time of the stop, he was not in any way suspicious that the pickup might have drugs aboard. He also added that he did not know that Castillo

---

* Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

and Sainz were Hispanics until Maria Castillo rolled down the window on the driver's side. McAffee testified that the pickup bore Texas license plates and had a "custom body," meaning it had "caps" on the tie-down holds and "fresh undercoating." He stated that under existing policies he was only authorized to issue a warning ticket.

After Castillo rolled down her window, McAffee testified that he told her why she had been stopped and asked for her driver's license and her vehicle registration. McAffee stated that he immediately noticed a strong odor of air-freshener emanating from the cab of the vehicle. Castillo produced a driver's license issued by the State of Washington, and, according to Officer McAffee, Castillo said the vehicle was co-owned by her and her uncle. There was then some discussion as to why Castillo did not have a Texas driver's license. McAffee then asked Castillo if she had any drugs in the pickup and she said there were none. Next, McAffee asked Castillo if he could search the vehicle and Castillo said he could. This conversation lasted about five minutes.

Officer McAffee returned to his patrol car and called for back-up aid. While in his car, he wrote a warning ticket and filled out a consent to search form, all of which took about an additional five minutes. He then returned to the pickup and gave Castillo a warning ticket and returned her driver's license and vehicle registration. He then had her read the consent to search form, which she did, and she then signed it.

By this time, Officer Mangelson arrived. The ensuing search of the pickup disclosed 103 pounds of marijuana in a duffle bag lying on the bed of the truck and a loaded .45 caliber handgun in the console between the driver's seat and the passenger's seat.

Both Castillo and Sainz testified at the hearing on their motions to suppress. Castillo and Sainz testified, *inter alia,* concerning the ownership of the car, which was apparently purchased by Sainz in Amarillo, Texas. Title was then placed in Castillo's

name. Castillo also testified that she signed the consent form before Officer McAffee returned her driver's license and vehicle registration.

The evidentiary hearing on the motion to suppress was held on December 23, 1993, at the conclusion of which the district court took the matter under advisement and allowed counsel to file memoranda in support of their respective positions. The hearing was resumed on January 7, 1994, after counsel had filed their memoranda. At the conclusion of that hearing, during which counsel made brief argument, the district court stated that it was going to grant the motion to suppress, stating further that the stop was pretextual, and that even if the stop was not pretextual, the ensuing detention was unlawful. The district court at that time made no mention of the consent given Officer McAffee by Castillo to search the vehicle. The final written order was signed by the district court on January 26, 1994, and now appears as *United States v. Castillo,* 864 F.Supp. 1090 (D.Utah 1994).

In *Castillo,* 864 F.Supp. at 1092, the district court, under the heading "FACTS," detailed the sequence of events between the initial stop and the discovery of the marijuana and the handgun ten minutes after the stop. As we read these "FACTS," the district court's position was basically, that even accepting as correct and accurate Officer McAffee's testimony, *in toto,* the stop was pretextual and the detention thereafter unlawful.[1] Although the district court at the December 23, 1993 and the January 7, 1994 hearings made no particular mention of the consent issue, in its written order of January 26, 1994, the district court held that under the circumstances, i.e. pretextual stop and unlawful detention, Castillo's consent was invalid.

### I. The Stop

 In concluding that Officer McAffee's act of stopping the Castillo vehicle was pre-

---

1. By way of example, we note that the district court found that McAffee returned Castillo's driver's license and vehicle registration, gave her a warning ticket and then asked her to read and sign the consent form. In this regard, Castillo testified that Officer McAffee did not return her driver's license and vehicle registration until after she signed the consent to search form.

textual, the district court relied on *United States v. Guzman*, 864 F.2d 1512 (10th Cir. 1988). In *Guzman* we held that the "classic example" of a pretextual stop "occurs when an officer stops a driver for a minor traffic violation in order to investigate a hunch that the driver is engaged in illegal drug activity." We then went on to state that the question when determining whether an officer had legal justification to stop a vehicle is "not whether the officer could validly make the stop, but whether under the same circumstances a reasonable officer would have made the stop in the absence of the invalid purpose."

As indicated, the district court held that the stop in the instant case was pretextual. If this issue was to be resolved by us on the basis of *Guzman*, a closer question might be presented. In this regard, it should be remembered, however, that the only evidence before the district court was that Officer McAffee stopped the Castillo vehicle because of its tinted windows which he believed violated a state equipment requirement. Officer McAffee stated that at that time he had no suspicion that the vehicle was transporting drugs or that the driver and passenger were Hispanics. Be that as it may, *Guzman* is no longer the law of this Circuit.

■ On December 5, 1995, this Court, sitting en banc, with Chief Judge Seymour and Judges Henry and Lucero dissenting, overruled *Guzman* and adopted a new test for determining when an initial stop of an automobile violates the Fourth Amendment. *See United States v. Botero-Ospina (Botero I)*, 71 F.3d 783 (10th Cir.1995). In *Botero I* we adopted the following standard for determining the constitutionality of a traffic stop: "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary or routine according to the general practice of

the police department or the particular officer making the stop.'"

Clearly, under *Botero I*, Officer McAffee's act of stopping the Castillo vehicle was not pretextual and did not in any way violate the Fourth Amendment. On the basis of *Botero I*, we reverse the district court's holding that the stop was pretextual and violated the Fourth Amendment.[2]

## II. The Detention

■ As indicated, the district court made an alternative holding that if the stop be deemed valid, the detention that ensued was unconstitutional. In *Botero I*, the court, sitting en banc, held that the other issues raised by Mr. Botero in his appeal were not before the en banc court and the case was returned to the panel, to which the case had been previously assigned, "to address the remaining issues." The panel thereafter on December 27, 1995 addressed the "remaining issues" in an unpublished order and judgment. *United States v. Botero-Ospina (Botero II)*, 1995 WL 763015. In that order and judgment the panel held, *inter alia*, that the detention was not unlawful.

The facts in *Botero I* are strikingly similar to those in the instant case. A sheriff's deputy, in Utah, saw a vehicle swerve from the outside lane, straddle the center line and swerve back to the outside lane. The deputy, fearing the driver was perhaps falling asleep or driving under the influence of drugs or alcohol, stopped the vehicle. He then asked the driver, Mr. Botero, for his driver's license and vehicle registration. There was conversation over the fact that the vehicle was registered to another person. After brief additional conversation, the deputy asked Mr. Botero if he had drugs or firearms in the car. Mr. Botero replied that he did not, whereupon the deputy asked if he could search the vehicle, to which Mr. Botero replied, "sure."

The facts of our case, which have been set forth above, are almost a carbon copy of the facts in *Botero I*. In any event, in line with our holding in *Botero II*, we hold that the

---

**2.** The new standard adopted by us in *Botero I* was applied by us in *United States v. Parker*, 72 F.3d 1444 (10th Cir.1995), which case was pending in this Court when *Botero I* was filed.

detention of Castillo and Sainz was not unlawful or violative of the Fourth Amendment.

### III. The Search

■ In our order and judgment in *Botero II*, we held that Mr. Botero's consent to search his vehicle was voluntary and that the ensuing search was not invalid. In line with *Botero II*, we hold that, under the circumstances described above, the consent given by Castillo was voluntary and the ensuing search was valid and not constitutionally infirm.

Judgment reversed and case remanded for further proceedings consonant with our opinion.